STATE OF NORTH CAROLINA v. ROY LEE FOX

No. 19

(Filed 31 July 1970)

1. **Homicide § 4— first degree murder — commission during felony — presumptions**

   Murder committed in the perpetration or attempted perpetration of any robbery, burglary or other felony is murder in the first degree; in these instances the law presumes premeditation and deliberation and the State is not put to further proof of either. G.S. 14-17.

2. **Homicide § 2— murder committed during perpetration of conspiracy — guilt of conspirators**

   When a conspiracy is formed to commit a robbery or burglary, and a murder is committed by any one of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree.

3. **Homicide § 12; Indictment and Warrant § 9— murder and burglary prosecutions — indictment — names of conspirators**

   In indictments charging the defendant with first degree burglary and with first degree murder committed during an armed robbery, it was proper to allege the names of the four persons who had conspired with defendant to commit the robbery, even though no conspiracy was expressly averred.

State v. Fox

4. **Indictment and Warrant § 7— retrial of defendant upon original indictment**

In a retrial of defendant for first degree murder and for burglary, it was proper to try the defendant upon the original indictment.

5. **Criminal Law § 92— consolidation of indictments for trial**

When two or more indictments are founded on one criminal transaction, it is contemplated that the court will consolidate them for trial. G.S. 15-152.

6. **Jury § 7— challenge for cause — jurors disavow outside influence**

Trial court properly overruled defendant's challenges for cause to three prospective jurors, where the jurors stated on the voir dire that they could decide the case on the evidence and on the law as enunciated by the court without being influenced by what they had read and heard or by any preconceived notions as to the law.

7. **Jury § 7— peremptory challenges— alternate jurors**

Ruling of the trial court which allowed defendant two peremptory challenges for each alternate juror was in conformity with the statute and was proper. G.S. 9-18.

8. **Jury § 7— challenge for cause — disallowance — preservation of exceptions**

In order to preserve an exception to the court's denial of a challenge for cause, the defendant must (1) exhaust his peremptory challenges and (2) thereafter assert his right to challenge peremptorily an additional juror.

9. **Criminal Law § 162— broadside objection to transcript — admissibility**

Where there was a broadside objection to the introduction of a transcript of testimony given at a previous trial, the transcript was properly admitted in evidence if any part of it was competent.

10. **Criminal Law § 40— transcript of testimony at former trial — admissibility — death of witness**

The official stenographic report of testimony given at a former trial by a witness who has since died may be introduced in evidence upon a subsequent trial of the cause upon proof of its authenticity and accuracy.

11. **Criminal Law § 40— transcript of former trial — reading by special prosecutor**

That the court permitted the special prosecutor, instead of the court reporter, to read the transcript of testimony given by an armed robbery victim at a former trial, *held* not prejudicial to defendant in his retrial for burglary and for first degree murder committed during the robbery.

12. **Criminal Law § 161— assignment of error — necessity for exceptions**

An assignment of error which is not supported by an exception

previously noted in the case on appeal presents no question of law for the Supreme Court to decide.

13. **Criminal Law § 162— appeal — evidentiary questions — assignment of error — prerequisites**

When the assignment of error is that the court erred in the admission or rejection of evidence, the evidence itself must be set out in the assignment; a mere reference to the record page where the asserted error may be discovered is not sufficient.

14. **Robbery § 3— wounds of robbery victim — evidence of description**

Testimony describing wounds received by victim of armed robbery was competent to corroborate the victim's testimony and to show the felonious purpose of the robbery.

15. **Criminal Law § 89— corroboration testimony — admissibility**

Testimony by police officers as to statements made to them by a robbery victim on the night the victim's wife was murdered was competent to corroborate the testimony of the victim.

16. **Homicide § 20; Criminal Law § 42— articles connected with crime — admissibility**

In a prosecution for burglary and for first degree murder committed during an armed robbery, a rubber mask, pistols, coats, a hat, a piece of cloth torn from one of the coats, a white handkerchief, and a rifle — articles which the investigating officers found either on the floor of the victim's kitchen or in the buried tow sack disclosed by one of the perpetrators — were competent to identify the perpetrators of the crime, as well as to show a design and plan.

17. **Criminal Law § 98— sequestration of witnesses**

Defendant's motion for the sequestration of the witnesses is addressed to the discretion of the court.

18. **Criminal Law §§ 33, 80— date of defendant's arrest — arrest sheet — testimony**

It was proper for a sheriff to testify that the arrest sheet in his office showed that defendant was arrested at a certain date and hour.

19. **Criminal Law § 76— confession — voir dire — consideration of testimony**

On voir dire to determine the admissibility of defendant's confession, the trial court was not bound by the defendant's testimony but he could consider the testimony of law enforcement officers.

20. **Criminal Law § 76— admissibility of confession — procedure — voir dire — findings of fact**

When the State offers a confession in a criminal trial and defendant objects, the competency of the confession must be determined by the trial judge in a preliminary inquiry in the absence of the jury; the trial judge hears the evidence, observes the demeanor of the witnesses, and resolves the question; his findings as to the voluntariness

of the confession, and any other facts which determine whether it meets the requirements for admissibility, are conclusive if they are supported by competent evidence in the record.

**21. Criminal Law § 75— confession — request for counsel**

Trial court properly admitted into evidence the defendant's confession to a sheriff, where the findings of fact established that the defendant made the confession and recorded it *prior* to his request for counsel.

**22. Criminal Law § 75— Miranda standards — applicability to retrial of cases originally tried before Miranda**

The Miranda standards for determining the admissibility of in-custody statements do not apply to post-Miranda retrials of cases originally tried prior to that decision.

**23. Criminal Law § 74— definition of confession**

A confession is generally defined as an acknowledgment in express words by the accused in a criminal case of his guilt charged or of some essential part of it.

**24. Criminal Law § 76— transcript of confession — corroborative evidence — admissibility**

A transcript of defendant's confession to the sheriff, which transcript was taken from a recording made by defendant in the sheriff's office after his first oral confession to the sheriff in his jail cell, *held* competent to corroborate the sheriff's statement of defendant's confession.

**25. Criminal Law § 81— best evidence rule — transcript of defendant's confession**

The best evidence rule did not preclude the admission of a transcript of defendant's confession to the sheriff, where the transcript was offered only as corroboration of the sheriff's testimony relating to his conversation with defendant.

**26. Criminal Law § 81— best evidence rule**

The best evidence rule applies only where the contents or terms of a document are in question.

**27. Criminal Law § 158— case on appeal — omission of the charge — presumptions**

Where the defendant has assigned no error to the charge of the court and the charge was not included in the case on appeal, it is presumed that the court correctly instructed the jury on every phase of the case, both with respect to the law and the evidence.

**28. Criminal Law § 157— appeal — essential parts of record — indictment — verdict**

The bill of indictment and the verdict are essential parts of the transcript record in a criminal appeal.

State v. Fox

29. **Criminal Law § 154— case on appeal — transcript — duty of solicitor**

Although the primary duty of preparing and docketing a true and adequate transcript of the record and case on appeal in a criminal case rests upon defense counsel, G.S. 1-282, G.S. 15-180, it is the duty of the solicitor to scrutinize the copy which appellants serve upon him; if it contains omissions, errors, or misleading juxtapositions it is the solicitor's responsibility to file exceptions or a counter case within his allotted time.

30. **Criminal Law § 154— case on appeal — acceptance by solicitor — binding on appellate court**

When the solicitor accepts the defendant's case on appeal and it is certified to the Appellate Division, it imports verity and the appellate court is bound by the record as certified.

MOORE, J., did not participate in the consideration or decision of this case.

APPEAL by defendant from *Snepp, J.,* 31 March 1969 Criminal Session of BUNCOMBE, docketed and argued in the Supreme Court as Case No. 12 at the Fall Term 1969.

At the November 1964 Criminal Session of Buncombe two bills of indictment were returned in which Roy Lee Fox, Arrlie Fox, Donald Fox, and Carson McMahan were jointly charged with murder in the first degree and burglary in the first degree. Bill No. 64-854 charged that on 10 November 1964 the four men "did unlawfully, willfully, and feloniously and of their malice aforethought kill and murder Ovella Curry Lunsford while they . . . were committing the crime of robbery with firearms. . . ." Bill No. 64-856 alleged that about midnight on 10 November 1964 the same four men, with the intent to steal, take, and carry away the property of Charles and Ovella Curry Lunsford, did feloniously and burglariously break and enter their dwelling while it was actually occupied by them. The cases were first tried at the February 1965 Session. During the course of the trial Arrlie Fox pled guilty to burglary in the first degree and received a life sentence. The jury found the other three defendants guilty as charged in both bills of indictment and, in each case, recommended that the punishment be imprisonment for life in the State's prison. From the sentences imposed defendants did not then appeal.

In February 1968, in consequence of a petition for certiorari filed by one of the defendants, we ordered counsel for the three to prosecute a joint appeal. Donald Fox died in April 1968, and

his appeal abated. We heard the belated appeals of Roy Lee Fox and Carson McMahan at our Fall Term 1968 and, for errors committed in the 1965 trial, we ordered a new trial as to each. *State v. Fox,* 274 NC 277, 163 SE 2d 492. In consequence, defendant Roy Lee Fox was retried upon the same two bills of indictment, which were consolidated for trial.

The trial was begun on 3 March 1969 with the solicitor, the assistant solicitor, and a former solicitor, Robert S. Swain, Esquire, who appeared as special prosecutor, representing the State. Defendant was represented by privately employed counsel, Robert B. Willson and John H. Giezentanner, as well as court-appointed counsel, Thomas E. L. Lipsey II. Neither the record nor the transcript discloses why the court appointed counsel for a defendant then represented by two privately employed attorneys. Defendant's motion to quash the bills of indictment because defendant was jointly charged therein with three co-defendants was denied, and the judge allowed the solicitor's motion that the two indictments be consolidated for trial. Twelve jurors and three alternates were selected from a special venire brought from McDowell County, and the jury was impaneled at 10:30 p.m. on 3 April 1969.

On *voir dire,* in the absence of the jury, the State offered evidence which tended to show: At the 1965 trial, Charles Houston Lunsford, the husband of the deceased, Ovella Curry Lunsford, was duly sworn and examined as a witness for the State. He was cross-examined by Mr. Cecil G. Jackson, counsel for defendant Roy Fox; by Mr. Don C. Young, attorney for Arrlie Fox; by Mr. Robert E. Riddle, attorney for Carson McMahan; and by Mr. Shelby E. Horton, attorney for Donald Fox. Mr. Lunsford's oral testimony was taken down in shorthand by Mrs. Dorothy P. Hoover, the official court reporter for that session. Thereafter she transcribed her notes and checked the accuracy of the transcription against the mechanical recording of Lunsford's testimony. A duplicate original of this transcript was marked State's Exhibit S-33. Mrs. Hoover testified that S-33 was "a true and accurate transcript of the evidence given by Charles Houston Lunsford in February 1965." Lunsford died 15 November 1968; he was, therefore, unavailable to testify as a witness at the 1969 trial.

State v. Fox

Judge Snepp found facts substantially in accordance with the foregoing statement and, subject to objections as to the competency, relevancy, and materiality of particular questions and answers, he ruled the transcript of Lunsford's testimony to be competent evidence. At the direction of the court, counsel for the State and defendant marked certain portions of it which were not to be read to the jury. The transcript was then introduced into evidence over the objection of defendant, who contended that no part of S-33 was competent. The special prosecutor, Mr. Swain, asked and received the court's permission to read the transcript to the jury. In brief summary, Lunsford's transcribed testimony tended to show:

In 1964 Lunsford and his wife, Ovella (55), lived on a farm on the Pisgah Highway in the Candler section of Buncombe County. Shortly after 11:00 p. m. on 10 November 1969 Mrs. Lunsford was in her upstairs bedroom; Mr. Lunsford was in the kitchen having a bedtime snack. Hearing a step, he turned to see a tall man standing about six feet from him in the door between the kitchen and a hallway, which led into his downstairs bedroom. The man had "a horrible looking mask on his face," and was wearing a three-quarters length coat, khaki or light green in color. He pointed a small pistol at Lunsford and said, "This is a holdup. We've come to get your money and we are going to get it."

Lunsford threw a bowl of applesauce at the intruder and "rushed him" into the bedroom. There Lunsford was hit from behind, and he and the first intruder fell on the bed. When Lunsford got up both the masked man and a second intruder had small pistols pointed at him. The latter, a stocky man with black hair, had a white cloth around his face and wore a dark coat. Lunsford called to his wife that "it was a holdup," and she came downstairs. One of the men threw her to one side and told Lunsford to give him his pocketbook or they would "get rough." Then the man with the handkerchief over his face fired at Lunsford. The bullet missed him and lodged in the wall. Lunsford "jumped the man," and the two scuffled into the kitchen where Lunsford succeeded in pulling the handkerchief from his face. The man was Donald Fox. During the scuffle, Mrs. Lunsford came in from the bedroom with a rifle. Lunsford told her to shoot but she had trouble with the safety. Two pistol shots were fired almost simultaneously, and blood gushed from his

wife's mouth. She said, "I have been shot, get me to a doctor, I am dying." At these words the two men fled, and Lunsford told her to get in the station wagon.

Lunsford, who still had on his person his billfold containing over $1,000.00, put the money in a drawer, locked the front door, and followed his wife to the car. Earlier in the evening all the tires had been inflated. Ignoring a flat tire he drove toward Asheville at such a speed that he was stopped by a police officer, who assisted him in getting to the hospital. There, while he was receiving emergency treatment, Lunsford was informed that his wife was dead.

Before that night Lunsford had seen Arrlie Fox at Treadway's farm, where he had negotiated a sale of hay. Thereafter Arrlie and a boy named "Hoot" had come to Lunsford's farm to get the hay. During the day the two had twice entered the house to use the telephone. Hoot paid Lunsford for the hay in cash, and Arrlie Fox saw him put the money in his billfold.

During his testimony Lunsford was shown a rubber mask, (S-10), which he identified as the one worn by the masked man who had entered his home on the night of November 10th. He testified that the two small pistols, (S-12 and S-13), looked like those the intruders had pointed at him. He was also shown a piece of blue cloth (S-16), a hat (S-15), a coat (S-11), and certain other articles of clothing which, he said, looked like items worn by the two men.

Other evidence for the State tended to show: About 11:30 p.m. on 10 November 1969 Police Officer McDevitt stopped Lunsford on Patton Avenue in Asheville at a point 12-15 miles from the Lunsford home. He was traveling at a high rate of speed in a station wagon from which the left rear tire was missing. Lunsford was covered with blood and driving with one hand while holding up his wife's head with the other. He told the officer what had occurred, and the officer led Lunsford to St. Joseph's Hospital. When the tireless wheel on the station wagon broke down, McDevitt pushed the vehicle into the hospital grounds.

After Mrs. Lunsford's death the coroner removed from her body a bullet (S-4), which had entered her chest, puncturing

both lungs and the supervena cava. She died from the resulting hemorrhages.

The Sheriff of Buncombe County, Harry P. Clay, went to the Lunsford home on 11 November 1964. He observed blood on the floors of the bedroom and kitchen; .22 shells, a dark cloth (S-16), and a felt hat (S-15) were on the kitchen floor. On 13 November 1964 Sheriff Clay and two of his deputies (Burleson and Mitchell) went with Arrlie Fox to a point beside an un-paved road off the Pisgah Highway about three miles from the Lunsford home. There Arrlie showed them a tow sack (S-39) which contained two trench coats (S-11 and S-38), two pistols (S-12 and S-13), the Lunsford rifle (S-14), a rubber mask (S-10), and a dirty white handkerchief (S-41).

A ballistics expert from the State Bureau of Investigation testified that the bullet (S-4) had been fired from a revolver of "the type displayed as State's Exhibit 13," the only kind which will cut ten grooves inclined to the right in a bullet. The re-volver (S-13) was made of such poor steel that the riflings are irregular.

Robert Worley (whose nickname is "Hoot") testified as follows: On 9 November 1964, as an employee of Kenneth Tread-way, he and Arrlie Fox went to the Lunsford farm to get four loads of hay, for which he paid Lunsford in cash. Twice during the day they went into the house to use the telephone. That night Arrlie stayed at Treadway's barn, and Hoot saw him with the small derringer pistol (S-12). On the next morning, November 10th, they unloaded the hay, and about noon Roy Lee Fox took Arrlie away in a truck.

Mrs. Joe Carter, a waitress-cook at Plemmons Truck Stop, testified that about 1:00 a.m. on 11 November 1964 defendant Roy Lee Fox, Donald Fox, Arrlie Fox, and Carson McMahan came to the Truck Stop and sat down at a table. Donald Fox had blood on his shirt. She gave him a bar of soap, and he and Arrlie disappeared into the rest room. Another waitress served the party, and Mrs. Carter paid them no further attention.

After the foregoing evidence had been introduced, counsel informed the court that the State would offer in evidence state-ments made by defendant to Sheriff Clay. Upon defendant's objection and motion to suppress this evidence, the court con-ducted a *voir dire* in the absence of the jury.

The State offered evidence which tended to show: Carson McMahan (aged 18) and Arrlie Fox (16) lived with defendant (28). On the basis of information given to officers by Arrlie and the articles in the sack found in the woods, Deputy Sheriff Brooks arrested Carson McMahan and defendant Roy Lee Fox about 4:30 p.m. on Friday, 13 November 1964. On the same information defendant's father and brother were also arrested. However, they were released as soon as investigation revealed they had no knowledge of the crime. About 9:30 that night defendant's wife was arrested. She was released the next morning and, about 11:00 a.m., defendant was advised of her release.

Defendant was informed by Deputy Sheriff Brooks, who talked to him for an hour shortly after his arrest, that he was being arrested in connection with the death of Mrs. Lunsford. Brooks also advised him of his right to counsel and told him that any statement he made could be used against him. Defendant said that he had done nothing, needed no lawyer, and wanted none. Thereafter, sometime before 6:00 p.m., Sheriff Clay talked to defendant for 10-15 minutes. He too told him that he did not have to make any statement; that if he did make one it could be used against him in court; that he was entitled to counsel and could call any attorney he wanted. Defendant again protested that, having done nothing, he neither needed nor wanted a lawyer. At that time the sheriff had in his possession the derringer pistol (S-12), the revolver (S-13), and the rubber mask (S-10). He showed these exhibits to defendant and asked him if he recognized any of them. Defendant looked at them and said nothing.

About 2:00 a.m. Clay again talked to defendant for about five minutes. Fox still maintained that he had done nothing. Sometime after daylight (Saturday, November 14th) defendant told the sheriff that he knew about the crime but had had nothing to do with it; that "they" had talked about it en route from his house to the truck stop; that he needed some money for groceries and had started to go with them but decided he just wouldn't do it; and that he had waited for "the others" at Plemmons Truck Stop.

On the morning of Saturday, November 14th, warrants charging defendant with first-degree murder and first-degree burglary were served upon him. Shortly after noon, the jailer, Deputy Sheriff Martin, informed the sheriff that defendant

wanted to see him. In consequence, the sheriff went to defendant's cell. Defendant, who appeared to have been crying, told him he wanted to make a statement and get the matter off his mind. Clay told him to think about it first. No promises of leniency or threats of any kind had been made to defendant before his confession. Nor was defendant told that reprisals would be taken against any member of his family if he did not confess. On Saturday morning defendant appeared to be worried, but he was not sick or under the influence of drugs or intoxicants. Defendant was silent for a short time and then related the following story:

On 10 November 1964, he and Carson McMahan had picked up Arrlie Fox at Treadway's stable. From there the three went to the home of Donald Fox. Arrlie told them about the money he had seen in Lunsford's billfold, and they decided to rob him; Donald thought it would be a "pushover." They then went to defendant's home where they put a mask, hat, and coats in a tow sack which they placed under the hood of Donald's truck. It was agreed that defendant would drive the truck and McMahan would stay with him; that Donald and Arrlie would go to the Lunsford house and get the money while defendant drove down the road; and that defendant would return for them. Arrlie had his little derringer (S-12), and defendant gave Donald his revolver (S-13). After letting the two out near the Lunsford home defendant made several trips by the house. On the last trip he heard a whistle and stopped. Donald and Arrlie jumped in the truck, and he drove away. The two were bloody and excited, and Donald told defendant he had shot Mrs. Lunsford. Arrlie said she was hurt bad because blood was running out of her mouth. Frightened by this news defendant drove to an embankment on a dirt road off the Pisgah Highway. There Donald and Arrlie buried the sack containing the weapons, mask, and green trench coat. Upon their return to the truck they discovered that one of the pistols had fallen out of the sack on the floorboard. Carrying the pistol and the rifle (S-14), which they had taken from the Lunsford home, they went back into the woods, put the weapons in the sack and reburied it. From there they went to Plemmons Truck Stop, where Donald and Arrlie washed themselves and threw away their socks. They then went home, and the next morning they read in the paper that Mrs. Lunsford was dead.

Defendant told the sheriff that the coats in the sack were those which Donald and Arrlie had worn in the Lunsford home. The green trench coat (S-11) still had on it applesauce from the bowl which Lunsford had thrown at Arrlie. Donald had worn the blue trench coat (S-38). In his scuffle with Donald, Lunsford had torn a piece of cloth out of it, the dark strip (S-16), which had been found on the kitchen floor.

Defendant made the foregoing statement to Sheriff Clay in his cell on the 14th floor of the jail. When he had finished, the sheriff had Deputy Burleson take defendant down to the sheriff's office where there was a "disc type recorder." There defendant repeated his statement, which was recorded as he spoke. From the recordings one of the official court reporters, Mrs. Annie Israel, later transcribed the statement (S-42) exactly as defendant made it.

After defendant had recorded his confession, Deputy Sheriff Burleson returned him to his cell. On the way back to the fourteenth floor he requested the deputy to call an attorney, Mr. Cecil Jackson. This was defendant's first request for an attorney. He had said nothing about an attorney on the way down to the sheriff's office. Burleson told the jailer of defendant's request, and he immediately called Jackson.

On Sunday afternoon, 15 November 1964, Sheriff Clay had defendant brought down to his office. He and Mrs. Israel asked defendant to go over the statement, which she had typed from the recording, to see if it was correct. His reply was that he would not sign anything unless his attorney, Mr. Cecil Jackson, was present. This was the sheriff's first knowledge that defendant had requested an attorney. He immediately called Mr. Jackson, who arrived about 3:00 p. m. The sheriff then played the recording in the presence of defendant, Mr. Jackson, and Mrs. Israel. After they had heard it, Clay asked defendant if the voice was his, and he replied, "Yes I guess it is."

Defendant's evidence on *voir dire* tended to show: About 1:00 p. m. on Saturday, 14 November 1964, the Buncombe County jailer called Mr. Cecil Jackson, Jr., an attorney, and told him that defendant wanted to see him. About 3:00 p. m. Jackson arrived at the jail and was told that defendant was with the sheriff. In a few minutes, however, Fox whom he had pre-

viously represented, came up from the sheriff's office. Jackson informed him of the seriousness of the charges against him, advised him of his constitutional rights, and inquired whether defendant's family could arrange to pay his fee. No financial arrangements were made with Jackson, and he was never privately retained to represent defendant. (Several weeks later Jackson was appointed by the court to represent him.) On the afternoon of 14 November 1964 defendant told Jackson that he had been questioned several times but had signed no statement; that he had told the sheriff "he was not along when the crime occurred." He did not mention having made another statement. Jackson next saw defendant about 3:00 p. m. on Sunday when Deputy Burleson called him to come to the sheriff's office. There he listened to the recording. Although he had not been employed he told defendant it was against his better judgment for him to sign a transcription of the recording. Defendant told Jackson that he had made a statement to the sheriff on Saturday before he had come to see him. He did not tell Jackson that he had been denied access to him or to any other attorney; nor did he make any complaint to him that he had been ill-treated, threatened, or promised any consideration in order to obtain the statement.

Defendant testified in his own behalf on *voir dire*. In summary he said: When he was arrested on 13 November 1964 he was not told why or where he was being taken. On the way "to where he was taking me," he asked the arresting officer, Mr. Brooks, to call an attorney and requested him to find out what he was charged with. Defendant was put in jail for about thirty minutes and then taken to the interrogation room, where he was told that he had been lying when he said he knew nothing about the Lunsford murder; that his wife had been arrested and she had sent him word to tell the truth because it would be lighter on him. Officers continued to interrogate him through the night, and every time anybody would move him or ask him a question he repeated his request for an attorney. On Saturday and Sunday he was suffering from a very bad cold and was in a "mentally disturbed" state. He has only a vague recollection of how many times he was interrogated or what he said; that he did not remember a record having been made of any conversation between him and Sheriff Clay and only vaguely remembered the playing of a transcription in Mr. Jackson's

presence on Sunday. Sheriff Clay did not threaten him, but he told him that he had his wife in jail and if he did not sign a statement he would see to it that she would be in Raleigh washing pots and pans. After reading the State's Exhibit 42, defendant denied that he made that statement to Sheriff Clay. He denied that he made any statement at all to him.

At the conclusion of the *voir dire,* Judge Snepp found facts, which are briefly summarized as follows:

Defendant was arrested by the Sheriff of Buncombe County about 4:30 p. m. on 13 November 1964 upon the basis of information given the sheriff by defendant's brother, Arrlie Fox. The information implicated defendant in the commission of the crimes for which he was then being tried and constituted probable cause for defendant's arrest. The information given by Arrlie Fox also tended to involve defendant's father, his brother, Leon, and defendant's wife, who were also taken into custody with probable cause. These three, however, were released as soon as investigation revealed they had no knowledge of the crimes.

After defendant's arrest, and before he was questioned, he was informed by the sheriff that he did not have to make any statements; that any statement he might make could be used against him; and that he could have a lawyer present if he so desired. Defendant said he had done nothing, did not need a lawyer, and did not want one. Defendant had made the same statement to Deputy Sheriff Brooks who had also warned him as the sheriff had done.

On the morning of 14 November 1964, warrants charging defendant with the crimes for which he stands indicted were served upon him. Shortly thereafter defendant told the sheriff that he had some knowledge of the crimes but had not participated in them. Sometime after noon on 14 November 1964 defendant sent for the sheriff and told him that he wanted to make a statement and get the matter off his chest. He then made a confession to the sheriff, which he later repeated in the sheriff's office so that it might be recorded.

After the recording was made, while on the way back to his jail cell, defendant requested Deputy Sheriff Burleson to call Mr. Cecil Jackson, an attorney. This was defendant's first

request for counsel. The jailer promptly called Mr. Jackson and that afternoon conferred with him at the jail. On the following day, 15 November 1964, during the early afternoon, defendant was taken to the sheriff's office for the purpose of verifying and signing a transcript of the recorded statement he had previously given the sheriff. At that time, defendant informed the sheriff that he was represented by Mr. Jackson. The sheriff suspended further activity until Mr. Jackson arrived. At that time the transcript was exhibited and the recording played in defendant's presence. Defendant was asked, in the presence of Mr. Jackson, whether the voice on the recording was his and he replied, in effect, that he reckoned it was. Defendant was not interrogated at any time after he requested the services of a lawyer except in the presence of the lawyer whom he had requested.

No threats or promises of any kind were made to defendant in order to secure the statement from him. He was not mistreated while confined in the Buncombe County jail, and there is "no credible evidence" that he was ill at the time he made the statements in question. Defendant was then 28 years of age. Although his formal education was limited he had worked in rodeos, on horse farms, and in similar activities. He had previously been charged with several criminal offenses and had retained lawyers to represent him. He had had experience in court. He had sufficient intelligence and knowledge to understand the nature of the charges made against him, his right to remain silent and to have counsel. He was advised of these rights, and he intelligently and understandingly waived his right to counsel until after he had made the statements to Sheriff Clay which were recorded and later transcribed as S-42. He had been fully informed from the time he was taken into custody of the nature of the charges being investigated and of the offenses with which he was charged.

Upon the foregoing findings of fact—all of which are supported by evidence appearing in the transcript—Judge Snepp concluded as a matter of law that the statements of defendant were competent evidence.

The jury was recalled and, in its presence, Sheriff Clay gave substantially the same evidence with reference to the statements made to him by defendant which he had given before

the judge on *voir dire*. Thereafter the transcribed copy of defendant's recorded statement (S-42) was received in evidence for the purpose of corroborating the sheriff's testimony. The mask (S-10), the green trench coat (S-11), the derringer pistol (S-12), defendant's revolver (S-13), the Lunsford rifle (S-14), the blue rag (S-16), the blue trench coat (S-38), the tow sack (S-39), and the dirty white handkerchief (S-41), were also introduced in evidence.

Defendant offered no evidence before the jury.

In the late afternoon of 9 April 1969 the jury returned its verdict. Defendant was found guilty of murder in the first degree with the recommendation that his punishment be imprisonment for life (Case No. 64-854) and guilty of burglary in the first degree with the recommendation that his punishment be imprisonment for life (Case No. 64-856). The court imposed the mandatory life sentences, adjudging that the sentence in Case No. 64-856 should begin at the expiration of the sentence imposed in Case No. 64-854. From these judgments defendant appealed to the Supreme Court, assigning errors which will be discussed in the opinion.

*Robert Morgan, Attorney General; Andrew A. Vanore, Jr., and Burley B. Mitchell, Jr., Staff Attorneys for the State.*

*T. E. L. Lipsey for defendant appellant.*

SHARP, J.

This case first came to us as a joint appeal by Roy Lee Fox and Carson McMahan, who had been tried with the other two defendants jointly indicted with them. Neither Roy Lee Fox nor Carson McMahan had testified, yet the confession of each, which implicated the other, had been admitted in evidence. This error necessitated a new trial and, in ordering it, we directed that defendants Roy Lee Fox and Carson McMahan be tried separately unless the State relinquished their confessions. *State v. Fox*, 274 N.C. 277, 291, 163 S.E. 2d 492, 502.

Upon the second trial, as in the first, all the evidence tended to show: Defendant and the three other persons named in each indictment had conspired to break and enter, during the night time, the dwelling occupied by Mr. and Mrs. Lunsford for the purpose of robbing Mr. Lunsford of his billfold. In furtherance of the conspiracy, defendant accoutered Donald and Arrlie for

the burglary, drove them to the locale, and gave Donald the pistol with which he thereafter shot Mrs. Lunsford during the attempt to rob Mr. Lunsford. While Donald and Arrlie went into the house to rob Lunsford, defendant drove around in the vicinity and returned to pick them up.

Defendant's first two assignments of error are that the trial judge erred (1) in "allowing" defendant to be retried upon the two original indictments in which he and three others were jointly charged with first-degree murder and burglary; and (2) in consolidating the two charges against defendant for trial. It is obvious, however, that the nature of the case dictated this procedure.

[1, 2] When a murder is "committed in the perpetration or attempt to perpetrate any . . . robbery, burglary or other felony," G.S. 14-17 declares it murder in the first degree. In those instances the law presumes premeditation and deliberation, and the State is not put to further proof of either. *State v. Bunton,* 247 N.C. 510, 101 S.E. 2d 454; *State v. Mays,* 225 N.C. 486, 35 S.E. 2d 494. Furthermore, when a conspiracy is formed to commit a robbery or burglary, and a murder is committed by any one of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree. On this evidence Roy Lee Fox was not only a co-conspirator with Arrlie and Donald Fox; he was constructively present aiding and abetting in the two crimes charged and, therefore, a principal. *State v. Sellers,* 266 N.C. 734, 147 S.E. 2d 225; *State v. Maynard,* 247 N.C. 462, 101 S.E. 2d 340; *State v. Green,* 207 N.C. 369, 177 S.E. 120; *Lindsey v. State,* 201 Ark. 87, 143 S. W. 2d 573; *Clernt v. State,* 109 Neb. 628, 192 N. W. 209; 77 C. J. S. *Robbery* § 32 (1952). See *State v. Bell,* 205 N.C. 225, 171 S.E. 50.

[3] In each of the two bills upon which defendant was tried it was entirely proper to name the four persons who had conspired to rob Mr. Lunsford even though no conspiracy was expressly averred. *State v. Maynard, supra.* However, since Roy Lee Fox himself did not enter the Lunsford home and was not *actually* present when Mrs. Lunsford was killed, the State was required to prove that he had conspired with Arrlie and Donald Fox who actually committed the burglary and murder.

[4, 5] Defendant's argument that it was error to retry defendant on the original indictment is that "by so doing the court

allowed evidence to be presented to the grand jury as to codefendants implicating the defendant thereby taking from him one of the legally required steps looking toward the second trial." The statement is puerile. Equally so is the statement that when the court consolidated the charges of murder and burglary, two offenses which grew out of one continuous criminal episode, the court "thereby compounded the original biased advantage that the State was allowed to take in the matter of the evidence that could be presented against the codefendants who were not on trial." When two or more indictments are founded on one criminal transaction G.S. 15-152 contemplates that the court will consolidate them for trial. *State v. Arsad,* 269 N.C. 184, 152 S.E. 2d 99; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506; *State v. White,* 256 N.C. 244, 123 S.E. 2d 483. In this case the facts required to convict defendant of murder would necessarily have convicted him of the burglary charged. For the judge to have put the State to two separate trials would have been unthinkable.

[6] The third assignment of error is that the court failed "to allow challenges for cause on jurors who were prejudiced as a result of knowledge admitted regarding adverse publicity about the defendant." This assignment of error, in complete disregard of our rules, does not specifically set out the jurors' "knowledge admitted" upon which the alleged error is predicated. *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416. The assignment refers to pages 30-34 of the record, where a portion of the *voir dire* examination of three prospective jurors is set out. After the court denied defendant's challenges for cause his counsel challenged each peremptorily. The first two were prospects for the original panel of twelve; the third was a prospective alternate. At the conclusion of their examination each of the three stated, in effect, that he could decide the case on the evidence and the law as enunciated by the court without being influenced by what he had read and heard or by any preconceived notions as to the law. The court's ruling that the three were competent jurors is sustained by numerous decisions of this Court. *See State v. DeGraffenreid,* 224 N.C. 517, 31 S.E. 2d 523 and the cases cited therein.

Defendant's case on appeal does not disclose whether, after he had exhausted his peremptory challenges, he unsuccessfully attempted to challenge an additional juror. Because of this inconclusiveness we read the 704-page transcript of the proceed-

State v. Fox

ings incident to the selection of the jury. It revealed that when twelve jurors had been selected defendant had exhausted only ten of his fourteen peremptory challenges and that, in response to a direct question from the judge, defendant stated he was "satisfied with them (the jurors) to hear his case." Thereafter three alternates were selected. In the selection of the first, defendant used his four unexpended challenges and one other. Before the second was seated he had used his two peremptory challenges, but he did not challenge the juror who was finally sworn as the second alternate. In the selection of the third alternate, defendant used only one peremptory challenge.

[7] Defendant's fourth assignment of error is that the court failed "to allow additional peremptory challenges for the alternate jurors and the defendant did exhaust his challenges at the time of the trial." In his brief, defendant makes this statement: "The Court over the objection of the defendant (R. pp. 34) ruled that the defendant would be allowed two challenges for ALL alternate jurors selected not two EACH as the statute reads and intended." Both the record and the certified transcript belie this statement. After defendant had exercised his first peremptory challenge during the selection of the second alternate the court said to counsel: "So there will be no misunderstanding I am going to hold that there will be two challenges as to each alternate because I don't know now whether there will be two or three alternates." This ruling was in conformity with G.S. 9-18 which provides that in the selection of alternate jurors after the regular jury has been impaneled, "Each party shall be entitled to two peremptory challenges as to each such alternate juror, in addition to any unexpended challenges the party may have left after the selection of the regular trial panel." Clearly the court did not deprive defendant of any peremptory challenge to which he was entitled, nor was defendant forced to accept any juror whom he had challenged peremptorily or for cause.

[8] "Numerous decisions of this Court, *e.g., State v. Dixon,* 215 N.C. 438, 440, 2 S.E. 2d 371, 372, hold that a defendant has not been prejudiced by the acceptance of a juror who is challenged for cause and the cause is disallowed unless he exhausts his peremptory challenges before the panel is completed. Other decisions, *e.g., Carter v. King,* 174 N.C. 549, 94 S.E. 4, hold that a defendant, in order to preserve his exception to the court's denial of a challenge for cause, must (1) exhaust his peremptory challenges *and* (2) thereafter assert his right to

challenge peremptorily an additional juror. These rulings are plainly and succinctly summarized in the first headnote in *Carter v. King* (174 N.C. 549), which epitomizes the decision in that case, as follows: 'Where the court has refused to stand aside a juror challenged for cause, and the party has then peremptorily challenged him, in order to get the benefit of his exception he must exhaust his remaining peremptory challenges, and then challenge another juror peremptorily to show his dissatisfaction with the jury, and except to the refusal of the court to allow it.' " *State v. Allred*, 275 N.C. 554, 563, 169 S.E. 2d 833, 838.

We find nothing in the case on appeal or transcript which suggests that defendant was not tried by a fair and impartial jury. Of the twelve jurors selected on the regular panel six were opposed to capital punishment; one was not asked his views; four "believed in" capital punishment only in "some cases." Only one stated without equivocation that he "believed in" capital punishment. Of the two alternates who were substituted for regular jurors, one did not believe in capital punishment and the other believed in it only "in some cases."

[9, 10] Defendant's fifth, sixth, and seventh assignments are that the court erred in admitting in evidence the transcript of the testimony given by Mr. Lunsford at the first trial (S-33), and in allowing it to be read to the jury by the special prosecutor, Mr. Swain. Defendant's objection to this transcript was "to the introduction or reading of either all or part of it." This was a broadside objection to the entire transcript. Upon such an objection it was properly admitted if any part of it was competent. *Grandy v. Walker*, 234 N.C. 734, 68 S.E. 2d 807; *Wilson v. Williams*, 215 N.C. 407, 2 S.E. 2d 19; 1 Strong N.C. Index 2d *Appeal and Error* § 30 (1967). It is well settled that the official stenographic report of testimony given at a former trial by a witness who has since died may be introduced in evidence upon a subsequent trial of the same cause upon proof of its authenticity and accuracy. *State v. Prince*, 270 N.C. 769, 154 S.E. 2d 897; *Settee v. Electric Railway*, 171 N.C. 440, 88 S.E. 734; *Cooper v. R. R.* 170 N.C. 490, 87 S.E. 322; Stansbury, N. C. Evidence § 145 (2d ed. 1963) ; Annot., 11 A. L. R. 2d 30, 58, 75.

[10] The transcript of Lunsford's testimony was properly received in evidence, and the judge specifically admitted it "subject to the competency, relevancy and materiality" of

specific questions and answers. Before it was read to the jury counsel for defendant and the State went through it and marked certain portions thereof which were not to be read. Presumably they agreed that these portions were either "irrelevant or incompetent." In any event, defendant interposed no objection to specific questions or answers in the transcript. This he was required to do if he would challenge their competency. *Grandy v. Walker, supra.* Nor did he object that specific questions and answers had been deleted. The entire transcript was offered and defendant, although reserving his right to object to the whole, concurred in the omissions. *Allen v. Allen,* 213 N.C. 264, 195 S.E. 801.

[11, 12] The assignment of error that the court permitted the special prosecutor to read the transcript instead of the court reporter is unsupported by any exception taken during the trial. The transcript reveals that when the judge asked who would read the stenographic report of Mr. Lunsfords' testimony to the jury Mr. Swain said, ". . . [P]erhaps the simplest way would be to have me to read it, read the whole thing." The court's reply was, "All right," and defendant made no objection. An assignment of error which is not supported by an exception previously noted in the case on appeal presents no question of law for this Court to decide. *Bulman v. Baptist Convention,* 248 N.C. 392, 103 S.E. 2d 487; *Darden v. Bone,* 254 N.C. 599, 119 S.E. 2d 634; *State v. Hudler,* 265 N.C. 382, 144 S.E. 2d 50. However, the record affirmatively shows that no prejudice resulted to the defendant from Mr. Swain's reading of the transcript. On his own copy the judge followed the prosecutor's reading of Lunsford's testimony very closely. If Mr. Swain omitted a single word or stumbled in his reading—as he did several times when (he said) his "eyes merged"—the court immediately admonished, "Watch your words here; read exactly what it says." In every such instance Mr. Swain reread the muffed line. Assignments of error 5, 6, and 7 are without merit.

[13] Assignment No. 8 is that the court erred "in allowing the testimony as to injuries to other than the deceased, Mrs. Ovella Lunsford." Assignment of error No. 9 is that the court erred "in failing to allow defendant's written motion to suppress identification of exhibits out of the presence of the jury prior to the preliminary investigation as to each exhibit's admissibility." Assignment No. 12 is that the court erred "in allowing statements made by Charles Houston Lunsford and others to

be received into evidence." These assignments of error are typical and characterize the work which went into the entire case on appeal. They manifest counsel's failure to inform himself of the rules of this Court and the numerous decisions calling attention to them. When the assignment is that the court erred in the admission or rejection of evidence the evidence itself must be set out in the assignment, and "a mere reference in the assignment of error to the record page where the asserted error may be discovered is not sufficient." In Re Will of Adams, 268 N.C. 565, 566, 151 S.E. 2d 59, 61; Rule 19(3), Rules of Practice in the Supreme Court of North Carolina and the annotations appearing thereunder; *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416; *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793; *State v. Douglas,* 268 N.C. 267, 150 S.E. 2d 412; *Pratt v. Bishop,* 257 N.C. 486, 126 S.E. 2d 597; *Darden v. Bone,* 254 N.C. 599, 119 S.E. 2d 634; *Bridges v. Graham,* 246 N.C. 371, 98 S.E. 2d 492.

[14-16]    Although the foregoing three assignments present no question for our consideration, for the reasons hereinafter set out, we have deemed it appropriate to consider every assignment of error which counsel has attempted to make. The description of Mr. Lunsford's wounds given by Dr. John C. Young, who saw him at the hospital after his wife was shot, was competent not only to corroborate the testimony of Mr. Lunsford but also to show the felonious purpose of the two men who had inflicted them after invading the Lunsford home. *State v. Payne,* 213 N.C. 719, 197 S.E. 573. The testimony of Officer McDevitt and Sheriff Clay (the subject of Assignment 12) as to statements made to them by Mr. Lunsford on the night Mrs. Lunsford was murdered were likewise competent to corroborate the testimony of Mr. Lunsford, and the court specifically limited them to that purpose. The record-page reference in Assignment 9 gives us no more clue in our search for error than did the assignment itself. However, the rubber mask, the pistols, the coats, the hat, the piece of cloth torn from one of the coats, the white handkerchief, and the rifle—articles which the investigating officers found either on the floor on the Lunsford kitchen or in the buried tow sack to which Arrlie Fox led them—were competent to identify the perpetrators of the crime, as well as to show a design and plan. *State v. Payne,* 213 N.C. 719, 197 S.E. 573; *State v. Brown,* 204 N.C. 392, 168 S.E. 532. "The evidence tied these items into the offense charged and made them properly admissible." *State v. Stroud,* 254 N.C. 765, 767, 119 S.E.

2d 907, 909. *Accord,* Stansbury, N. C. Evidence § 118 (2d ed. 1963).

[17]   Assignments 8, 9, and 12 are overruled.   So also is Assignment 10, which charges that the court erred in failing to allow defendant's motion to sequester the State's witnesses. The motion of defendant for the sequestration of the witnesses was addressed to the discretion of the court, and no suggestion of abuse appears upon the record. *State v. Yoes* and *Hale v. State,* 271 N.C. 616, 157 S.E. 2d 386; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506.

[18]   Assignment No. 21 is that the court erred in allowing Sheriff Clay to testify that the arrest sheet (a record of his office) showed that defendant was arrested at 4:30 p. m. on Friday, 13 November 1964. This evidence was elicited during the State's attempt to establish the time Sheriff Clay first talked to defendant. When he did not recall the exact time, Mr. Swain asked him if he knew "about what time" defendant was brought to the sheriff's office. The answer was, "Yes sir, the arrest sheet shows he was arrested at 4:30." Defendant objected but made no motion to strike the answer. That the quoted statement was not prejudicial to defendant, however, is so apparent that no discussion of this assignment is required. The sheriff could, of course, have used the arrest sheet to refresh his recollection. Stansbury, N. C. Evidence § 32 (2d ed. 1963).

In his brief defendant specifically abandons assignments of error 11, 13, 15, 19, 20, 22, and 23.

Assignments 14, 16, and 17 relate to defendant's confession. Assignments 14 and 16 are that its admission was error "in the light of the arrest of his family and other circumstances of his confinement" and because it "was unsigned and not verified by him in any way." Assignment 17 is that it was error to allow in evidence "a paper writing purporting to be the confession of Roy Lee Fox when the best evidence would have been an alleged recording which was not produced by the State."

[19, 20]   In his brief defendant says, ". . . [T]he judge should not have made the findings of fact as he did at the time the confession was allowed in evidence." Apparently defendant attacks the admissibility of his confession upon the assumption that the judge was bound by his statements on *voir dire* and required to disregard any conflicting testimony given by law

enforcement officers or others. This, of course, is not the law. *State v. Clyburn,* 273 N.C. 284, 159 S.E. 2d 868; *State v. Logner,* 266 N.C. 238, 145 S.E. 2d 867. When the State offers a confession in a criminal trial and defendant objects, the competency of the confession must be determined by the trial judge in a preliminary inquiry in the absence of the jury. *State v. Vickers,* 274 N.C. 311, 163 S.E. 2d 481. The trial judge hears the evidence, observes the demeanor of the witnesses, and resolves the question. *State v. Barber,* 268 N.C. 509, 151 S.E. 2d 51. His findings as to the voluntariness of the confession, and any other facts which determine whether it meets the requirements for admissibility, are conclusive if they are supported by competent evidence in the record. *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1; *State v. Barnes,* 264 N.C. 517, 142 S.E. 2d 344; *State v. Keith,* 266 N.C. 263, 145 S.E. 2d 841.

[21] On defendant's first trial the judge failed to make any finding with reference to the time defendant requested the jailer to call an attorney (Mr. Jackson) for him. In sending the case back for a retrial we said: "If Roy voluntarily made the statement (S-42), or the earlier one which was not transcribed, and *thereafter* requested counsel for the first time, he was not deprived of his Sixth Amendment right to counsel. If, however, *after* he had requested an attorney, and *before* he was given an opportunity to confer with him, officers continued to interrogate Roy, any incriminating statement thus elicited cannot be received in evidence against him. The ruling upon the admissibility of any statement which Roy may have made must await the findings of material facts to be made by the judge at the next trial." *State v. Fox, supra* at 295, 163 S.E. 2d at 505. These findings have now been made, and they establish that defendant first requested counsel after he had made a confession to Sheriff Clay on the fourteenth floor of the jail and after he had left the sheriff's office where he had made and recorded the same inculpatory statements. Other findings by the judge establish that, prior to making his confession, defendant was fully advised of his constitutional rights as they were then understood.

[22] Both defendant's confession and his first trial antedated the decision in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (13 June 1966). It was held in *Jenkins v. Delaware,* 395 U.S. 213, 23 L. Ed. 2d 253, 89 S. Ct. 1677 (2 June 1969), that Miranda's standards for determining the admissi-

bility of in-custody statements do not apply to post-Miranda retrials of cases originally tried prior to that decision. *See State v. Swann*, 275 N.C. 644, 170 S.E. 2d 611.

[23] A confession is generally defined as an acknowledgment in express words by the accused in a criminal case of his guilt of the crime charged or of some essential part of it. *State v. Hamer*, 240 N.C. 85, 81 S.E. 2d 193. "[I]t may be oral or written in whole or in part; and there is no requirement that an oral confession be reduced to writing or that the oral statement, after transcription by another, be signed by the accused." 23 C.J.S. *Criminal Law* § 816, p. 154 (1961). *Accord, State v. Clyburn, supra.*

[24] Defendant's confession, which was admitted in evidence, was the oral statement which he made to the sheriff in the jail and again in the sheriff's office. The transcription of the recording made during defendant's second statement to the sheriff (S-42)—which defendant never signed—was admitted in evidence solely for the purpose of corroborating the sheriff's testimony as to what defendant had said to him. The sheriff testified that this transcription, which had been transcribed by the court reporter, Mrs. Israel, was "an exact copy of the words which were spoken between (himself) and Roy Lee Fox on November 14, 1964 and as recorded."

The transcript was clearly competent to corroborate Sheriff Clay's statement of defendant's confession. In any event, however, its contents were merely repetitive of the sheriff's testimony, and no prejudice could have resulted to defendant from its admission. The case of *State v. Walker*, 269 N.C. 135, 152 S.E. 2d 133, upon which he relies "as the leading case in this State on the point," is not pertinent. In *Walker*, the State introduced a typewritten statement narrating an investigating officer's interpretation of his interview with the defendant. The statement recited that the defendant had read it before signing it. However, on *voir dire*, the officer himself testified that the defendant not only had not read it, but he had refused to read it and had no knowledge of its contents. In awarding a new trial for the error of its admission, this Court said: "There is a sharp difference between reading from a transcript which, according to sworn testimony, records the exact words used by an accused, and reading a memorandum that purports to be an interpretative narration of what the officer understood to be

the purport of statements made by the accused." *Id.* at 141, 152 S.E. 2d 138.

[25, 26] Defendant's contention that S-42 was inadmissible because "the best evidence would have been the alleged recording" is likewise without substance. "The best evidence rule applies only where the *contents* or *terms* of a document are in question." Stansbury, N.C. Evidence § 191 (2d ed. 1963). In *State v. Ray*, 209 N.C. 772, 184 S.E. 836, parol evidence was admitted to establish the contents of a freight car. The defendant objected to parol evidence because the records of the railroad company showed its contents. On appeal the Court said: "The making of a record did not prohibit a witness who loaded the car and saw what went into it, from testifying as to its contents." *Id.* at 777, 184 S.E. at 839. As previously noted, the transcript was not offered as defendant's confession but as corroboration of the sheriff's testimony as to his conversation with defendant. The fact that there was a recording of it did not prevent the sheriff from testifying as to what was said. The recording—upon proper authentication—would have been admissible. Had defendant requested its production undoubtedly the court would have required the State to produce it. However, defendant did not request the recording, nor did he base his objection to the admission of S-42 upon the ground he now asserts. Indeed, at the time he stated no reason for his objection. Assignments of error 14, 16, and 17 are overruled.

The final assignment (No. 18) is that "the Court erred in its comments, ruling, and procedures which resulted in the State being assisted in the prosecution of its case to the prejudice of the defense. Defendant's exceptions Nos. 23, 25, 26, 33, 34, 39, 40, 42 and 43 (R. pp. 66-83)." The assignment reveals its failure to point out the alleged errors relied upon. It therefore presents no question for our consideration. *State v. Kirby, supra.* Notwithstanding, we have examined each of the exception numbers to which it refers and find all to be wholly without merit. Indeed, only one (No. 34) is supported by an objection interposed during the trial. That objection was to a properly identified photograph, taken in the Lunsford home, which was offered to illustrate the testimony of Mr. Lunsford. Two of the exceptions which counsel inserted at the time of making up the case on appeal relate to recesses of the court—one taken for the convenience of defendant—which the court called on his own accord. Exception No. 40 is to the statement of Deputy Sheriff

State v. Fox

Johnson that he had received the exhibits which had been offered in evidence at the first trial. His next statement revealed that he received them on 6 November 1967 for the purpose of delivering them to the Clerk of the Supreme Court. At the time this testimony was elicited defendant did not object to the question or move to strike the answer. However, his failure to do so is immaterial; the evidence was competent. Exceptions 23 and 42 were inserted in the case on appeal at two points in the trial where the court in its discretion permitted Mr. Swain to withdraw a witness for the purpose of qualifying an exhibit about which he wished to question the witness. Nos. 25 and 26 relate to statements made by the judge when the prosecution offered in evidence three photographs to which defendant made no objection. Notwithstanding, the court declined to receive them because one (S-21) had not been identified and two (S-8 and S-9) illustrated no evidence which had been introduced up to that time. Assignment No. 18 is overruled.

[27]  We note that defendant has assigned no error to the charge of the court and that it was not included in the case on appeal. It is presumed, therefore, that the court correctly instructed the jury on every phase of the case, both with respect to the law and the evidence. *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363.

[28]  Because this is defendant's second appeal from a conviction upon two indictments for capital crimes which occurred almost six years ago we have examined the record of the trial below with great care. Our task was hampered and made onerous by an inaccurate record and a carelessly prepared case on appeal. Appellant's counsel, whose responsibility it is to make certain that all essential parts of the record are filed in this Court, that the case on appeal is in compliance with our rules, and that it presents a clear and accurate account of the proceedings below, failed in this duty. Omitted from the record were the bill of indictment in case No. 24-856 and the verdicts in both cases Nos. 24-856 and 25-854, "essential parts of the transcript record in a criminal action brought to this Court." *State v. Stubbs,* 265 N.C. 420, 423, 144 S.E. 2d 262, 265. The written orders made throughout the trial and the judgments from which defendant appealed were not shown to have been signed by the judge. *Inter alia,* we could not tell from the case on appeal whether the *voir dire* held to determine the compet-

ency of defendant's confession was conducted out of the presence of the jury.

The Attorney General, in two addenda, supplied the omissions of the essential portions of the record so that we might review the case. He also secured a certified transcript of the stenographic report of the trial in order to determine the order in which proceedings were had and when they were out of the presence of the jury. At the instance of defendant's counsel and with the consent of the Attorney General, another addendum was filed to add assignments of error which counsel had omitted. These addenda, of course, increased the expense of a case which had already cost in excess of $21,000.00. Unwilling to impose the penalty of a new trial upon the State and county unless justice actually required it, we waived the failure to comply with our rules and did what was necessary to inform ourselves as to what actually happened at the trial. Having done so, we are satisfied that the case was well and fairly tried by the judge below and that, during the trial, defendant was adequately represented by counsel who fully protected his rights. On appeal we have seen to it that defendant's right to have his trial fully reviewed has not been prejudiced.

[29, 30] Although the primary duty of preparing and docketing a true and adequate transcript of the record and case on appeal in a criminal case rests upon defense counsel, G.S. 1-282, G.S. 15-180, it is the duty of the solicitor to scrutinize the copy which appellant serves upon him. If it contains omissions, errors, or misleading juxtapositions it is the solicitor's responsibility to file exceptions or a counter case within his allotted time. He tried the case before the jury, and he is the State's only representative who is in position to evaluate the appellant's statement of the case on appeal. The Attorney General, who must defend the case in the Appellate Division, is dependent upon the solicitor for a valid record of the trial below. When the solicitor accepts the defendant's case on appeal and it is certified to the Appellate Division, it imports verity and the appellate court is bound by the record as certified. *State v. Miller*, 214 N.C. 317, 199 S.E. 89; 1 N.C. Index 2d *Appeal and Error* § 42; 3 N.C. Index 2d *Criminal Law* § 160 (1967). It costs the State and profits a solicitor nothing if, after spending ten days in a trial such as this, we order a new trial for an error appearing in the transcript when none actually occurred. We again call the attention of defense counsel to our admonition in *State v.*

*Benton, supra* at 660, 174 S.E. 2d at 806. At the same time we remind the solicitors that their obligation to a case does not end when the judge pronounces sentence. Their duty includes policing the case on appeal. This, of course, necessitates the expenditure of the time and effort required to make a careful and painstaking examination of it and to file exceptions or counter case if either is necessary to provide a correct record and a case on appeal which truly and intelligibly sets out the proceedings as they occurred. Only upon such a record can the Attorney General and the Appellate Division do justice to the State and to the defendant. In the trial below we find

No error.

MOORE, J., did not participate in the consideration or decision of this case.