STATE OF NORTH CAROLINA v. CURTIS HENDERSON AND MOSES PRICE, JR.

No. 21

(Filed 15 April 1970)

**1. Homicide § 21— murder in perpetration of attempted armed robbery — sufficiency of evidence**

In this prosecution for first degree murder committed in the perpetration of an attempted armed robbery, the State's evidence, including an in-court identification of defendants as the perpetrators of the robbery and

murder and testimony that a witness overheard defendants planning the robbery, *is held* sufficient for the jury, the apparent contradictions in the testimony and the equivocation of some of the witnesses bearing upon the weight of the evidence or its credibility and not upon its competency, and the jury being the trier of the facts.

**2. Criminal Law § 50; Evidence § 42— testimony that statement was forthright, complete and articulate — shorthand statement of fact**

Testimony by the solicitor of a municipal-county court that in a conference with the State's principal witness immediately prior to a preliminary hearing held in that court, the witness was reluctant to talk, and that "suddenly the boy began to talk and he was very forthright and complete and gave an articulate statement" may well be considered a shorthand statement of fact, and its admission was not prejudicial error.

**3. Criminal Law § 132— motion to set aside verdict as contrary to weight of evidence**

A motion to set aside the verdict as being contrary to the weight of the evidence is addressed to the discretion of the trial judge.

**4. Criminal Law § 166— abandonment of assignments of error**

Assignments of error not supported by reason or authority in defendant's brief will be deemed abandoned. Supreme Court Rule No. 28.

**5. Criminal Law § 163— assignments of error to charge — failure to indicate particular error asserted**

Assignments of error which quote excerpts from the charge and assert the court erred in so charging the jury, but which fail to indicate in what particular any of the quoted excerpts is erroneous, do not comply with the requirement of Supreme Court Rule 19(3) that the asserted error be clearly presented without the necessity of going beyond the assignment itself to learn what the question is.

**6. Criminal Law §§ 112, 168— instructions — "if you find from the evidence" — beyond a reasonable doubt**

The trial court did not commit prejudicial error in using in one portion of the charge the words "if you find from the evidence" instead of "if you find from the evidence beyond a reasonable doubt," where in other portions of the charge the court fully and correctly instructed the jury that the burden was on the State to satisfy the jury beyond a reasonable doubt as to the guilt of defendant before such verdict could be returned.

**7. Criminal Law §§ 9, 163; Homicide § 25— instructions — homicide committed during robbery — conspiracy to rob**

In this consolidated trial of two defendants for a homicide committed in the perpetration of an attempted armed robbery, trial court's instruction to the effect that if the attempted robbery and murder were committed pursuant to a conspiracy to rob, each conspirator would be responsible for the acts of the other on the occasion the crime was committed, but in the absence of such conspiracy, each would be guilty only if he individually was engaged in the perpetration of the attempted robbery and fired the fatal shots, was not unclear and ambiguous, and was favorable

to defendants, since each would be responsible for the acts of the other if both were present, aiding and abetting each other in the perpetration of the attempted robbery, even though there were no previously formed conspiracy.

**8. Criminal Law § 168— instructions — State's rebuttal evidence — harmless error**

In this prosecution for first degree murder, defendants were not prejudiced by an instruction that the State offered rebuttal evidence "in substance opposed to the testimony of" the State's principal witness "to explain away some of the discrepancies between the testimony of certain officers" presented by the State and that of an officer who testified for defendant, although the instruction was somewhat confusing in that the rebuttal evidence obviously was not offered in opposition to the State's principal witness, but only to explain discrepancies in the testimony of the officers.

**9. Criminal Law § 163— exception to charge embracing number of propositions**

An exception to a portion of the charge embracing a number of propositions is insufficient if any of the propositions are correct.

**10. Criminal Law § 163— exception to excerpt from charge — challenge to omission**

An exception to an excerpt from the charge ordinarily does not challenge the omission of the court to charge further on the same or another aspect of the case.

**11. Criminal Law §§ 118, 168— instructions — contentions of State — discrepancies and conflicts in evidence**

In this prosecution for first degree murder, defendants were not prejudiced by the court's frequent references to the discrepancies and conflicts in the evidence while reviewing the contentions of the State, where the court's references thereto tended to emphasize rather than minimize the significance of the discrepancies and conflicts, and it is clear from the evidence and charge that the respective contentions of the State and of defendants with reference to these discrepancies and conflicts were well understood by the jury.

**12. Criminal Law §§ 118, 168— instructions — review of State's contentions — statement that witness "put it very accurately" — harmless error**

In this prosecution for first degree murder, defendants were not prejudiced when the court, while reviewing the contentions of the State, expressed the view that he thought a State's witness had "put it very accurately" that there was a marked reluctance on the part of the State's principal witness to be the only eyewitness against one of the defendants, where all the evidence tended to show that at the beginning of a conference preceding defendants' preliminary hearing, the State's principal witness was reluctant to talk, and the State's evidence was that this reluctance was based on his belief that he was to be the only witness against one defendant and that this reluctance ceased when he learned that other witnesses were to testify against such defendant.

**13. Criminal Law § 126— polling the jury — failure of record to show each juror assented to verdict — certificate of clerk of court**

Defendant's contention that the Supreme Court should order a new trial *ex mero motu* because the record on appeal does not show affirmatively that, when the jury was polled, each and every juror assented to the verdict, *is held* without merit, the Court having obtained a certificate from the clerk of superior court to the effect that subsequent to the announcement of the verdict, each juror, upon being polled by the clerk as to each defendant, replied that his verdict was guilty of murder in the first degree with recommendation that the punishment be imprisonment for life.

MOORE, J., did not participate in the consideration or decision of this case.

APPEAL by defendants under G.S. 7A-27(a) from *Mintz, J.,* January 1969 Criminal Session of LENOIR Superior Court, docketed and argued as No. 21 at Fall Term 1969.

At December 1968 Session, the grand jury of Lenoir County returned a bill of indictment charging that defendants on October 5, 1968, murdered Woodrow Stanley.

Evidence was offered by the State and by each defendant.

*Uncontradicted* evidence offered by the State tended to establish that Woodrow Stanley (Stanley) was shot and fatally injured on Saturday, October 5, 1968, shortly before 11:00 p.m., in the parking area portion of the premises of Stanley's Supermarket (Supermarket), under the circumstances narrated below.

The Supermarket property is located in Kinston, N. C., at the southwest corner of the intersection of Washington Street and Clay Street, and is designated 811 East Washington Street. It fronts eighty-one feet on the south side of Washington Street and extends one hundred and sixty-two feet along the west side of Clay Street. The store building is in the northeast portion of the lot, thirty feet south from the Washington Street curb and seven feet west from the Clay Street curb. The building has a frontage of twenty-three feet and extends south at that width sixty feet. An open space in the shape of the letter "L" extends (1) south from Washington Street and west of the building to a fence along the back property line, and thence (2) east between the back of the building and the fence to Clay Street. In the portion which extends (at the width of fifty-one feet) south from Washington Street, there are eleven parking spaces along the west property line. These spaces point diagonally towards the west side of the building. Near the back property line of this portion are four parking spaces with lines pointed towards Washington Street. There are no parking spaces in the area extending from the rear of the building a distance of seventy-two feet to the

fence. This area provides access to and from Clay Street. Stanley's station wagon was parked in the second parking space from Washington Street and was backed towards the west property line. The front was headed diagonally towards the west side of the building. The car of Venters, an employee, was parked, headed towards the back fence, in one of the four parking spaces at the rear of the parking area.

The Supermarket was closed to the public about 10:45 p.m. Stanley, the owner-operator, and his employees were making preparations to leave. Upon locking and leaving the store, Stanley and two of his employees, Phillip Rhugaber (Rhugaber) and Stanley Lee (Lee), went to Stanley's station wagon; and the four other employees, James Robert Williams (Williams), Johnnie Ray Miller (Miller), James Lacewell (Lacewell) and Harry Venters (Venters) went to the Venters car.

Lee and Rhugaber got in the Stanley station wagon, Lee on the front seat and Rhugaber on the back seat. Stanley got in the driver's seat. Before he could close the door two colored men came running towards the station wagon and asked for change for a dollar. One of them stopped at the door beside Stanley, on the driver's side, and the other went to the back of the station wagon. After Stanley stated he had left all the money in the store, he was told: "This is a stickup, Woodrow, give me the money. . . . I know you have got it because I saw you put it in a bag, give it to me." A first shot was fired. When Lee started to get out, the man who fired the shot said: "If you open that door I will kill you." Lee was "scared to death" and "just froze." Again the man asked for the money. Stanley was sitting in the car with the door open. A second shot was fired. When this occurred, Stanley reached over and got a bag of groceries, threw it out and said, "There is your money, go home." Stanley grabbed the wheel, blew the horn and tried to get out of the car. He finally "made it outside," still blowing the horn. A third shot was fired. Thereupon, Stanley "turned the wheel aloose and fell." Just before he fell, the man who fired the shots grabbed Stanley's billfold from his pocket and ran. Both men ran from the back of the station wagon towards the back of the parking area, across the area in back of the store building and towards Clay Street. Lee got out of the station wagon and hollered to Venters: "They shot Mr. Stanley." In running from the station wagon, the two men involved in the holdup passed the parked car of Venters.

Lee testified to the facts narrated in the preceding paragraph. He testified also that the man who did the shooting was "standing

up all the time"; that all shots were fired by the man on the driver's side; and that he could not see the face of either of the men.

Rhugaber did not testify. Lee and Rhugaber told an investigating officer that night (October 5-6, 1968) that they could not identify either of the men.

Unconscious, Stanley was taken by ambulance to the hospital and died en route or shortly after arrival. An autopsy disclosed that three bullets had penetrated his body. Death was caused by a bullet that had penetrated his left chest, left lung and heart.

Williams, aged 17, and Miller, aged 18, two of the four Stanley employees who went to the Venters car, testified as witnesses for the State. Lacewell and Venters did not testify.

Portions of the testimony of Williams and of Miller as to what happened after they reached the Venters car, exclusive of testimony bearing upon the identification of defendants, are narrated below.

According to Williams: He and Miller got in the back seat of the Venters car and Lacewell got in the front seat. Venters, outside the car, hollered, "Somebody shot Mr. Stanley." Thereupon, the occupants of the car jumped out and all ran towards the station wagon. When they got "some distance" from it, they heard *somebody* say, "Stop, or I'll shoot," and all "turned around and went back the other way." Williams (but none of the other three) got back in the Venters car. From the back seat of the Venters car, looking through the back glass, Williams saw "tussling" on the driver's side (far side from Williams) of the station wagon. On the passenger's side, towards the back, he "saw a guy peeping into a bag." When the tussling ceased, a guy, who came from the driver's side of the station wagon, ran by the Venters car and said, "Don't move or I'll shoot you." The man was about fifteen feet from Williams. Venters was "out there" when the man passed and made that statement. A few seconds later the man with the bag ran from the passenger's side of the station wagon. He fell before he reached Clay Street, dropped something from the bag he was carrying, picked it up, put it back in the bag and started running again. When he fell, Williams got out of the Venters car and attempted to overtake the man with the bag by cutting him off as he ran down Clay Street. However, Williams ran into the fence that extended along the rear of the parking lot. The man who came from the driver's side of the station wagon was the first to run by the Venters car. He had a pistol in his hand. After Stanley was put in the ambulance, Williams went to the station wagon, found Stanley's money (over $2,000.00) in a bag, and gave the money to one of the officers.

According to Miller: When Venters said, "Somebody is shooting Mr. Stanley," those in the Venters car hopped out and started towards the station wagon. A man standing behind the station wagon on the passenger's side was looking into a bag. Miller went approximately eighteen steps towards the station wagon. When he was about ten steps from the station wagon, the man said: "Halt, or I'll shoot." Lacewell said, "Come on Johnnie," and when Miller looked up Lacewell "was across the fence." Miller heard one shot before he got out of the Venters car. He saw the man who had the bag fall, get up and pick up some packages. There was another man on the far side of the station wagon. He (Miller) could hear him but did not see him.

The parking areas of the Supermarket premises were well lighted by mercury lights when the events relating to the attempted robbery and the murder occurred.

Evidence offered by the State, which was *contradicted* by the personal testimony of each defendant and by evidence offered in their behalf, included the following:

Williams testified that defendant Henderson was the man who came from the driver's side of the station wagon and, with pistol in hand, said, "Don't move or I'll shoot you," as he passed by the Venters car; and that defendant Price was the man on the passenger's side of the station wagon who looked into the bag and fell on the parking lot while running towards Clay Street.

Miller testified defendant Price was the man on the passenger's side of the station who looked into the bag, the man who said, "Halt, or I'll shoot," when Miller and others first approached the station wagon, and the man who fell on the parking lot while running towards Clay Street. (Note: Miller did not testify as to the identity of the man on the far (driver's) side of the Station wagon or as to what that man may have said or done.)

Johnnie Thomas, aged 22, testified that, in September, 1968, at "Miss Annie's house" on Washington Street, he overheard the following conversation between defendant Price and defendant Henderson, *viz.:* "Moses told Curtis he was getting hungry and Curtis said 'What do you expect me to do about it?' Moses said that he had to have some money and he was going to get some money because he was broke. Moses Price. Curtis didn't say anything. After awhile Curtis Henderson said 'I need some money, I'm going back to Boston.' Then Moses said 'I know Mr. Stanley and he has got some loot on him. I believe I'll hit him but I have got to find a way to do it.' Curtis said 'I used to have a credit account there at the store

but I'm with you.' Moses said 'Let's do it tonight,' but Henderson said not tonight he had some business to attend to."

Evidence for the State tended to show Thomas had made a statement to this effect to an officer on or about October 14, 1968, when in jail on a forgery charge; and that Thomas had pleaded guilty to forgery at October 1968 Session of Lenoir Superior Court and received a probationary sentence.

Separate warrants, each based on an affidavit of Carl Long, were issued October 24, 1968. Each charged the accused with the murder of Stanley on October 5, 1968.

The evidence most favorable to the State tended to show that Price was arrested first; that he was arrested by Detective Long; that Private Detective Whaley and Deputy Sheriff Eubanks were present; that, upon arrival at the courthouse, Detective Long went off with other officers; that Price, in the company of Whaley and Eubanks, got to the top of the steps of the courthouse and was coming into the two swinging glass doors when he (Price) fell down on his knees, hanging to the door, and said, "Oh, God, why did I do it?" and broke down and began crying in the presence of these officers. (Note: Detective Long, a witness for defendant, testified that he was with Whaley, Eubanks and Price when they entered the courthouse; that Price "was crying, saying he didn't do anything, and he couldn't hardly walk"; that he saw Price, crying, go down on his knees, but that he didn't hear him say, "Why did I do it? Oh, my Lord, why did I do it?")

The evidence most favorable to the State tended to show the warrant for the arrest of defendant Henderson was served on him at his father-in-law's home on Lincoln Street; that the officers present included Private Detective Whaley, Deputy Sheriffs Eubanks, Ipock, and Brake, and Detective Long; that when Henderson saw them drive up he came out and asked them what they wanted him for; that, although he was denied permission to do so, he forced his way until he got back into the house; that after the warrant had been read to him, Henderson said, "Shoot me, I'd rather be dead, shoot me," and "ran down the street hollering"; and that he had run approximately four blocks when he was stopped on Lincoln Street by Detective Long. (Note: Detective Long, a witness for defendant, testified the officers went first to Henderson's home; that he was not at his home but was at his mother's house; that they talked with him and placed him under arrest and the warrant was read to him; that Henderson stated he wanted to say something to his wife and that he (Detective Long) let him; that Henderson came back out

of the door and said, "he had nothing to hide and he jumped up and said you might as well kill me, I haven't done anything, and he took off running and left everybody"; and that when he (Detective Long) apprehended him, Henderson stated "that he didn't know why he run, he just panicked and ran, that he hadn't done anything.")

The evidence, reduced to narrative form and single spaced, occupies one hundred and thirty pages of the mimeographed record. Other features of the evidence will be referred to in the opinion.

As to each defendant, the jury returned a verdict of "Guilty of murder in the first degree with recommendation of life imprisonment"; and, as to each defendant, the court pronounced a judgment which imposed a sentence of life imprisonment.

Each defendant gave notice of appeal. An order was entered that each be represented on appeal by his trial counsel and that Lenoir County pay all costs necessary to perfect the appeal.

*Attorney General Morgan, Deputy Attorney General Moody and Staff Attorney Mitchell for the State.*

*Beech & Pollock, by D. D. Pollock, for defendant appellant Henderson.*

*Brock & Gerrans, by C. E. Gerrans, for defendant appellant Price.*

BOBBITT, C.J.

Although they present their fourteen assignments of error in a joint statement, each defendant filed a separate brief.

**[1]** Assignments of Error Nos. 2 and 4 are based on defendants' exceptions to the denial of their motions under G.S. 15-173 for judgments as in case of nonsuit.

In the consideration of these assignments, we apply the well-established and oft-stated rules summarized in 2 Strong's North Carolina Index 2d, Criminal Law § 104, as follows: "On motion to nonsuit, the evidence must be considered in the light most favorable to the state, and the state is entitled to every reasonable intendment thereon and every reasonable inference therefrom. Contradictions and discrepancies, even in the state's evidence, are for the jury to resolve, and do not warrant nonsuit. Only the evidence favorable to the state will be considered, and defendant's evidence relating to matters of defense, or defendant's evidence in conflict with that of the state, will not be considered."

The *credibility* of the State's crucial evidence, particularly the testimony of Williams, Miller and Thomas, was sharply challenged by cross-examination and by defendants' testimony and by evidence offered in their behalf.

Williams, who identified both Price and Henderson in his testimony at trial, did not know either defendant *by name* on the night of the attempted robbery and the murder of Stanley. Miller, who identified Price in his testimony at trial, did not know him *by name* on the night of the attempted robbery and the murder of Stanley.

As witnesses for the State, various officers, namely, a Kinston Police Officer (Loftin), two Kinston Detectives (Brooks and Gay), a Private Detective (Whaley) and an SBI Agent (Campbell), testified to statements made by Williams in response to their inquiries. Portions of this testimony tended to corroborate Williams' testimony at trial. Other portions thereof tended to show discrepancies and conflicts between Williams' testimony at trial and statements previously made by him. Conflicts between the testimony of certain of the State's witnesses and the testimony of Detective Long, a witness for Henderson, are noted in our preliminary statement. The testimony of Thomas was contradicted by each defendant in his personal testimony and also by the testimony of Mrs. Annie Belle Shaw ("Miss Annie"). Testimony of Thomas, under cross-examination, tended to show Thomas' prior criminal record; that he had "pulled five years" in prison and in addition had "pulled some time just around the city jail"; and that he was in custody for forgery when he told the officers of overhearing the conversation at "Miss Annie's house" and under a probationary sentence for forgery when he testified for the State against defendants. Too, each defendant offered alibi evidence. This evidence tended to show the defendants were not together on the night of October 5th and that each was at a location in Kinston other than the premises of the Supermarket.

This statement from the opinion of Stacy, C.J., in *State v. Satterfield,* 207 N.C. 118, 176 S.E. 466, is applicable: "Counsel for the defendant assailed the State's case with force and vigor, pointing out the apparent contradictions in the testimony and the equivocation of some of the witnesses, but these were matters bearing upon the weight of the evidence or its credibility, and not upon its competency. The jurors alone are the triers of the facts."

Considered in the light of applicable legal principles, the evidence was sufficient to require submission to the jury and to support the verdict. Hence, the assignments of error with reference to nonsuit are without merit.

Assignment of Error No. 1 contains nothing of sufficient significance to require discussion and is overruled.

[2]   A preliminary hearing was conducted November 1, 1968, in the Municipal-County Recorder's Court. The solicitor of that court, P. H. Crawford, Jr., as a rebuttal witness for the State, testified to his conversation with Williams, in the presence of several law enforcement officers, in the judge's office adjoining the courtroom, preparatory to the hearing. A portion of his testimony is the subject of Assignment of Error No. 3.

Mr. Crawford testified in part as follows: "At the beginning of my conference with him he indicated a very pronounced reluctance to talk, he replied to questions in monosyllables and I had difficulty in bringing him out. I insisted to him that what I wanted him to tell me was exactly what he knew about the facts and what happened, and one or two of those present made similar statements to him about telling me what happened, to tell the truth. One of those present, I think it was Mr. Whaley, made the statement to him — if there are not the words it is the substance; he said 'Tell it to Mr. Crawford just like you told it to me.' (And almost suddenly the boy began to talk and he was very forthright and complete — Objection overruled — and gave an articulate statement.) DEFENDANTS' EXCEPTION NO. 3. Yes, sir, immediately after my conference with him he testified at the hearing."

Although the words "Objection overruled" appear in the record as indicated, the record does not show the question to which the objection was addressed. Nor does the record show that defendants made a motion to strike any particular portion of Mr. Crawford's testimony.

In their briefs, defendants call attention to "DEFENDANTS' EXCEPTION NO. 3," on which they base Assignment of Error No. 3. Their only point seems to be that Crawford was testifying to an opinion or conclusion as distinguished from facts. We perceive no error prejudicial to defendants. Crawford's testimony that Williams was reluctant to talk when the conference began and later talked freely constituted what may well be considered a shorthand statement of fact. Stansbury, N. C. Evidence, Second Edition, § 125. If deemed desirable, counsel for defendants could have explored in depth exactly what Williams said at various stages of this conference.

[3]   Assignment of Error No. 14 asserts "the court erred in overruling the defendants' motions to set aside the verdict for that the

evidence was overwhelmingly against the verdict, for errors made during the trial, and for arrest of judgment." No ground for the arrest of judgment is suggested other than defendants' contentions that the verdicts were contrary to the weight of the evidence. Since this was a matter for determination by the trial judge in the exercise of his discretion, this assignment is deemed formal.

**[4]** In his brief, Henderson expressly abandons Assignments of Error Nos. 6 and 7. Since Price's brief states no reason and cites no authority in support thereof, these assignments will be taken as abandoned by him. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810; *Freeman v. City of Charlotte,* 273 N.C. 113, 116, 159 S.E. 2d 327, 329.

**[5]** Assignments of Error Nos. 5-13, inclusive, quote excerpts from the charge and assert the court erred in so charging the jury. In these assignments, defendants do not indicate in what particular any of the quoted excerpts is erroneous. They ignore the requirement of Rule 19(3), Rules of Practice in the Supreme Court, 254 N.C. 783, 797, as interpreted in numerous decisions of this Court, that "always the very error relied upon shall be definitely and clearly presented, and the Court not compelled to go beyond the assignment itself to learn what the question is." *State v. Mills,* 244 N.C. 487, 94 S.E. 2d 324.

The excerpt on which Assignment of Error No. 5 is based is the only portion of the charge assigned as error which relates to an instruction with reference to a legal principle. Other portions of the charge assigned as error involve either the court's review of evidence or statement of contentions.

**[6]** With reference to Assignment of Error No. 5, Price contends that the court used the words, "if you find from the evidence," instead of the words, "if you find from the evidence beyond a reasonable doubt." In other portions of the charge, the court fully and correctly instructed the jury that the burden was on the State to satisfy the jury beyond a reasonable doubt as to the guilt of the defendants or either of them before such verdict(s) could be returned. The contention advanced by Price is without merit.

**[7]** Henderson's contention with reference to Assignment of Error No. 5 is that the instruction given in the quoted excerpt was "unclear and ambiguous." This contention is without merit. The clear import of the instruction is that if the attempted robbery and the murder were committed pursuant to a conspiracy to rob, each conspirator would be responsible for the acts of the other on the occasion the

crime was committed; but, in the absence of such conspiracy, each would be guilty only if he individually was engaged in the perpetration of the attempted robbery and fired the fatal shots. The instructions were favorable to defendants. It is noteworthy that the court failed to instruct the jury as to the legal principle that each would be responsible for the acts of the other if both were present, aiding and abetting each other in the perpetration of the attempted robbery, even if there were no evidence of a previously formed conspiracy. Too, the charge was quite favorable to defendants in that, notwithstanding all the evidence tended to show a murder committed in the perpetration of an attempted robbery, the court instructed the jury it would be permissible for them to return a verdict of guilty of murder in the second degree as to either or both of the defendants.

The excerpt from the charge on which Assignment of Error No. 8 is based consists of a brief summary by the court of the testimony of (State's witness) Loftin. We find no significant conflict between the court's summary and Loftin's testimony. This assignment is without merit.

[8] The excerpt from the charge on which Assignment of Error No. 9 is based is in these words: "The State offered a number of rebuttal witnesses — I am not going to recount their testimony, or attempt to recapitulate it here — you heard it this morning, and it was offered in substance opposed to the testimony of James Robert Williams to explain away some of the discrepancies between the testimony of certain officers, Eubanks, Whaley and others, and Officer Carl Long. I assume that was the purpose of the offer. That was all given today and you will recall it."

Obviously, the rebuttal evidence was not offered "in substance opposed to the testimony of James Robert Williams," the State's principal witness, but was offered in an attempt "to explain away some of the discrepancies" between the testimony of Officer Eubanks, Whaley and others, on the one hand, and the testimony of Officer Long, on the other hand. Although this portion of the charge as reported seems somewhat confusing, we find nothing therein which may be considered prejudicial to defendants.

[9] The remaining excerpts from the charge, on which Assignments of Error Nos. 10, 11, 12 and 13 are based, consist of the court's review of certain of the *contentions* of the State. The excerpts on which Assignments of Error Nos. 10 and 11 are based are lengthy and involve multiple and diverse matters. Apparently, defendants were inadvertent to the rule that "an exception to a portion of a

charge embracing a number of propositions is insufficient if any of the propositions are correct." *Powell v. Daniel*, 236 N.C. 489, 493, 73 S.E. 2d 143, 146, and cases cited. The excerpt on which Assignment of Error No. 12 is based is worded as follows: "The State says and contends that even the discrepancies between the testimony of Officer Carl Long and some of the other officers *are not as pronounced as they appear* when they are examined in the light of the whole case, and consider that the memory of people who are active in law enforcement work is, like others, it is not perfect; they may not remember exactly what happened at a given session at a given time." (Our italics.) This sufficiently illustrates the type of statement of contention which defendants assert constitutes prejudicial error.

[10, 11] The discrepancies and conflicts in the evidence were obvious. Defendants did not except to the failure of the court to charge the jury in respect of any matter. "It is elemental that an exception to an excerpt from the charge ordinarily does not challenge the omission of the court to charge further on the same or another aspect of the case." *Peek v. Trust Co.*, 242 N.C. 1, 16, 86 S.E. 2d 745, 757. Be that as it may, it would seem the court's frequent references to the discrepancies and conflicts in the evidence tended to emphasize rather that to minimize the significance thereof. Careful readings of the evidence and of the charge make it clear that the respective contentions of the State and of defendants with reference to these discrepancies and conflicts were well understood by the jury. These assignments fail to disclose prejudicial error and are overruled.

[12] In the lengthy excerpt on which Assignment of Error No. 11 is based, the court, while reciting contentions of the State, said: ". . . and there is evidence here that he (James Robert Williams) did have some reluctance — it was recited by Mr. Crawford, who I thought put it very accurately, that there was a marked reluctance on his part to be the only eyewitness to talk about Henderson." Conceding the court should not have expressed the view that he thought (State's witness) Crawford had "put it very accurately," all the evidence tended to show that, at the beginning of the conference preceding the preliminary hearing, Williams was in fact reluctant to talk. Indeed, (defense witness) Long testified that Williams stated "he was not going in there and testify about Curtis Henderson because he could not positively identify him." According to the State's evidence, the initial reluctance of Williams to testify against Henderson was based on his belief that he was to be the only witness against Henderson and that this reluctance ceased when he learned that other witnesses were to testify against Henderson.

Assignment of Error No. 11 fails to disclose prejudicial error and is overruled.

While, as indicated, the assignments of error, except those relating to nonsuit, do not comply with our rules, we have elected to consider all of them and all contentions made with reference thereto in the briefs. After reading and re-reading the evidence and the charge, we find no error deemed prejudicial to the defendants or either of them. The real issues in dispute were factual in nature. They were resolved adversely to defendants by the jury.

[13] The record shows the following:

"THE JURORS, BEING CALLED BY NAME AND BEING INDIVIDUALLY POLLED BY THE CLERK OF SUPERIOR COURT, RENDERED THE FOLLOWING VERDICTS:

"*AS TO THE DEFENDANT, MOSES PRICE, JR.:*

"VERDICT: 'Guilty of murder in the first degree with recommendation of life imprisonment.'

"*AS TO THE DEFENDANT, CURTIS HENDERSON:*

"VERDICT: 'Guilty of murder in the first degree with recommendation of life imprisonment.'

"Upon the bringing in of the verdict as to the defendant, Moses Price, Jr., said defendant, through counsel, requested that the jury be polled.

"THE CLERK OF SUPERIOR COURT POLLED THE JURY.

"Upon the bringing in of the verdict as to the defendant, Curtis Henderson, said defendant, through counsel, requested that the jury be polled.

"THE CLERK OF SUPERIOR COURT POLLED THE JURY."

In their briefs, each defendant asserts that, although there is no exception or assignment of error in respect of the polling of the jury, the record does not disclose affirmatively that each and every juror assented to the verdict. They contend the Court should order a new trial *ex mero motu* on authority of *State v. Dow,* 246 N.C. 644, 99 S.E. 2d 860. The contention is without merit.

In *State v. Dow, supra,* the record showed that the jurors were polled in open court and that the responses of *all* the jurors were not in accord with the verdict as announced by the foreman of the jury. Here, defendants' counsel did not include in the record what occurred when the jury was polled. In view of the contention made in their briefs, we have obtained a certificate from the Clerk of the

Superior Court of Lenoir County to the effect that, subsequent to the announcement of the verdict, each juror, upon being polled by the clerk as to each defendant, replied that his verdict was guilty of murder in the first degree with recommendation that the punishment be imprisonment for life.

Finding no prejudicial error in the trial, the verdict and judgment will not be disturbed.

No error.

MOORE, J., did not participate in the consideration or decision of this case.