STATE OF NORTH CAROLINA v. CHARLES CURTIS HAIRSTON
STATE OF NORTH CAROLINA v. EDWARD ALEXANDER HOWARD
STATE OF NORTH CAROLINA v. EARNEST McINTYRE, JR.

No. 130

(Filed 14 January 1972)

**1. Criminal Law § 166— abandonment of assignments of error**

Assignments of error not discussed in defendants' briefs are deemed abandoned.

**2. Criminal Law § 21— necessity for preliminary hearing**

In North Carolina a preliminary hearing is not a constitutional requirement and is not essential to the finding of an indictment.

**3. Criminal Law § 21— waiver of preliminary hearing**

The preliminary hearing may be waived, in which case the defendant is bound over to the superior court to await grand jury action without forfeiting any right or defense available to him.

**4. Constitutional Law § 32; Criminal Law § 21— preliminary hearing — right to appointment of counsel**

An indigent defendant is entitled to have counsel appointed to represent him in a preliminary hearing. G.S. 7A-451(b)(4).

**5. Constitutional Law § 32; Criminal Law § 21— failure to appoint counsel for preliminary hearing**

Failure of the court to appoint counsel to represent defendant at his preliminary hearing was not error where the court found upon competent evidence that for the purpose of the preliminary hearing defendant was not an indigent and was in a position to employ his own attorney, defendant informed the court prior to the hearing that he did not want an attorney but wished to represent himself, and defendant signed a written waiver of counsel.

**6. Criminal Law § 51— qualification of expert**

The trial court in this homicide prosecution did not err in allowing a pathologist to give expert testimony before he was found to be an expert, where defendant made no request for a finding by the court as to the qualification of the witness as an expert, and where, upon defendant's objection to a question calling for an opinion as to the cause of death, the court examined the witness as to his qualifications and then found him to be an expert in pathology.

**7. Criminal Law § 33; Homicide § 15— evidence that defendants were members of "Mau Mau"**

The trial court in this homicide prosecution did not err in allowing testimony that defendants were members of a group known as the "Mau Mau," that such group met twice a week in each other's homes, and that the members would go out into the woods and practice shooting, since the testimony showed that defendants knew each

other, associated together, had access to firearms, and had practice and training in the use of firearms, all of which was relevant and material to support the State's theory of a conspiracy to rob and, if necessary, to kill the victim.

8. **Criminal Law § 114; Homicide § 25— instructions on malice — use of word "black"**

In instructing the jury that malice is "wickedness, a disposition to do wrong, a black and diabolical heart regardless of social duty and fatally bent on mischief," the court's use of the word "black" did not refer to the fact that the defendants are Negroes but was an adjective synonymous with evil.

9. **Homicide § 21— first degree murder — conspiracy and robbery by all defendants — killing by one defendant**

Defendants' motions for nonsuit in this first degree murder prosecution were properly denied where the State's evidence tended to show that one of the defendants shot and killed the victim while all defendants were carrying out a conspiracy to rob the victim and while they were actually engaged in the perpetration or attempted perpetration of the felony of robbery.

10. **Conspiracy § 5— declarations of conspirator — admission against coconspirator**

When a conspiracy has been established, declarations of any one of the conspirators made while the conspiracy is in existence and in furtherance of the common design are admissible against the other conspirators.

11. **Criminal Law § 79— statement by conspirator — admission against coconspirators**

The trial court did not err in the admission of testimony that a member of a group which included the defendants stated that they "were going to knock a store off," notwithstanding the witness did not know which member of the group made the statement, where all the evidence tended to show a conspiracy to commit robbery and that the statement was made by one of the conspirators while on the way to the scene of the crime.

12. **Criminal Law § 87— leading questions by solicitor**

The trial court did not err in allowing the solicitor to ask leading questions of a State's witness for the purpose of showing that the witness did not implicate one of the defendants in the crime in his initial statement to the police because such defendant had threatened to kill him if he talked.

13. **Criminal Law § 38; Homicide § 15— officer's view from spot where shot was fired**

In this homicide prosecution, the trial court did not err in allowing a police officer to testify that he viewed the scene of the crime on the night of the murder and the next day, and that when standing in the place from which the fatal shot was allegedly fired, he could see the spot where the victim fell.

14. **Criminal Law § 169— objection — similar testimony admitted without objection**

The benefit of an objection is lost where the witness had previously given the same testimony without objection.

15. **Criminal Law § 117— instructions on testimony by accomplices**

An instruction that the jury should "examine" the testimony of accomplices with the "greatest care and caution" is equivalent to an instruction which defendants contend the court should have given that the jury "should scrutinize and look carefully into the testimony of accomplices."

16. **Homicide § 4— murder in perpetration of a felony**

A murder committed in the perpetration or attempt to perpetrate any felony within the purview of G.S. 14-17 is murder in the first degree, irrespective of premeditation or deliberation or malice aforethought.

17. **Homicide § 30— first degree murder — failure to submit second degree murder**

In this prosecution for first degree murder, the trial court did not err in failing to instruct the jury on second degree murder where all the evidence was to the effect that the victim was killed in the perpetration or attempted perpetration of the felony of robbery.

18. **Conspiracy § 7; Homicide § 25— instructions — abandonment of conspiracy**

Where the evidence shows that all the defendants had formed a conspiracy to commit a robbery and that in attempting to perpetrate this crime one defendant shot and killed the robbery victim, the trial court correctly refused to charge the jury that the conspiracy had been abandoned and that the other defendants were not accountable for the act of the defendant who did the shooting, notwithstanding there was testimony that prior to the robbery the conspirators had decided not to shoot the victim but only to hit him and take his money.

APPEAL by defendants from *Kivett, J.,* 10 May 1971 Session of FORSYTH Superior Court.

Defendants, Charles Hairston, Edward Howard, and Earnest McIntyre, were each indicted in separate bills of indictment, proper in form, for the murder of Roy Minor on 6 January 1971. The court appointed separate counsel to represent each defendant. Defendants entered pleas of not guilty. The cases were consolidated for trial, and the jury returned a verdict of guilty of murder in the first degree as to each defendant and recommended that each defendant be imprisoned for life. From judgments imprisoning defendants in the State's prison for life, defendants appealed.

State v. Hairston and State v. Howard and State v. McIntyre

The State's evidence tends to show that Roy Minor operated a small grocery store on Cameron Avenue in the city of Winston-Salem. Reedy Carter was employed at this store by Minor. Around 6 p.m. on 6 January 1971, Minor and Carter closed the store and left, Minor going toward his car parked a few feet from the store on a bridge and Carter going off in another direction. Carter heard a shot, turned and saw Minor fall behind his car. On seeing this, Carter ran to a nearby home and asked the occupants to call an ambulance and the police. He then returned to the vicinity of the store. There he saw three youths standing on the sidewalk. Carter did not know any of the three by name, but did recognize one and later identified him at the preliminary hearing and in court as being Earnest McIntyre, one of the defendants. The area in the vicinity of the store was fairly well lighted. A street light was on a nearby corner, a small light was on the outside of the store building, and the area was further illuminated by the headlights of a car which arrived just after the shooting occurred. Mr. Minor was shot in the right temple and died from severe brain injury due to a wound from a shotgun slug.

Around 5:45 p.m. on 6 January 1971, Durkin Woodruff and Bobby Hairston, both of whom testified for the State, met with Earnest McIntyre, Charles Hairston, and Edward Howard at the home of Bobby Hairston. These five were members of a local club called the "Mau Mau." McIntyre was the leader. The group met twice a week at each other's homes. They had guns and would go out in the woods to practice shooting. Howard and McIntyre instructed the others. On the night in question, shortly after 5:45 p.m., the five left Bobby Hairston's home. Bobby Hairston had a 20-gauge shotgun loaded with three slugs; Charles Hairston had a 410-gauge shotgun. The group followed a path to a wooded area near Minor's Grocery. On the way to the store Bobby Hairston asked where they were going, to which one member of the group replied that they were going to "knock off a store." After arriving at this wooded area, the group discussed robbing the man who ran the store and which one of them would do the shooting. Bobby Hairston gave the 20-gauge shotgun to Charles Hairston, and Durkin Woodruff had the 40-gauge shotgun in his possession. Bobby Hairston, McIntyre and Howard then left with the intention of "hitting the man, snatching the money and running." After these three had left the wooded area, Charles Hairston, upon seeing Mr. Minor leave

the grocery store, raised the 20-gauge shotgun, shot and killed him. Upon hearing the shot, Howard, McIntyre, and Bobby Hairston walked to a point near the body and stood for a few minutes. They then left and went to a lady's home. They stayed there for a while and then returned to their respective homes. Later on that evening, Charles Hairston and Bobby Hairston went to get the guns which Charles Hairston and Durkin Woodruff had hidden on the way to the lady's home. The 20-gauge shotgun belonging to Bobby Hairston contained only two of the three slugs he had earlier loaded in it. At the home where the five met shortly after the shooting, Howard and McIntyre congratulated Charles Hairston for being a good shot, and McIntyre told the others that he would "knock off" anyone who talked. The next day when it was found that Mr. Minor was dead, Charles Hairston laughed and said that he "should have been dead." Just prior to the preliminary hearing, McIntyre again told Bobby Hairston that if he said anything about the shooting he would come down to the training school and get him.

When first questioned by the police, Bobby Hairston did not admit any knowledge of the murder. At a later time, however, both Bobby Hairston and Durkin Woodruff made statements to the police although neither's statement contained any reference to McIntyre's part in the murder or to the fact that they had gone to the lady's house after the shooting. Both later stated that the reason they had made no reference to these facts in their earlier statement was because of their fear of McIntyre. At the trial both testified to facts substantially as set out above.

Defendants offered no evidence.

*Attorney General Robert Morgan and Associate Attorney Edwin M. Speas, Jr., for the State.*

*Stephen G. Calaway for defendant Hairston, appellant.*

*William G. Pfefferkorn for defendant McIntyre, appellant.*

*J. Erle McMichael and Thomas W. Moore, Jr., for defendant Howard, appellant.*

MOORE, Justice.

[1] On appeal defendants set forth 21 assignments of error. Assignments Nos. 3, 11, 12 and 18 are not discussed in defend-

ants' briefs and are therefore deemed abandoned. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810 (1961). Nevertheless, since these are capital cases, these assignments have been carefully considered and found to be without merit.

Defendant McIntyre first assigns as error the court's failure to provide him with counsel at the preliminary hearing. On 8 March 1971 McIntyre appeared before Judge Sherk of the District Court for a hearing to determine whether counsel should be appointed to defend him. The court found that defendant had a job with George Sparks Construction Company and made $90 per week, that his wife worked and made $385 per month, and that they owned an automobile and furniture. Based on these findings, the court refused to appoint counsel.

On 11 March 1971 defendant McIntyre appeared before Judge Sherk for a preliminary hearing. At that time the court inquired into whether the defendant wanted counsel appointed. Defendant specifically refused the appointment of counsel, stating that he had had trial experience in the service and did not need an attorney.

Before trial, William G. Pfefferkorn was appointed counsel for McIntyre. Counsel then moved that the indictment against McIntyre be quashed and that all proceedings against defendant be dismissed with prejudice for the reason that a preliminary hearing was held for the defendant on the capital offense of murder, and at said time defendant was not appointed counsel as required by the Constitution and statutes of North Carolina and by the Constitution of the United States. On 18 May 1971 a hearing was held on this motion before Charles Kivett, Judge Presiding, at which hearing the State offered the testimony of Judge A. Lincoln Sherk, before whom the preliminary hearing was held; Mr. George Thomas, an attorney at law in the city of Winston-Salem; Mr. R. H. Frye, one of the investigating officers from the Winston-Salem Police Department; and James C. Yates, III, the assistant solicitor. Defendant McIntyre took the stand and testified in his own behalf. After this hearing, the court made, among others, the following findings:

" . . . [T]hat on the date of March 8, 1971, a short time after his arrest, the defendant was taken into the District Court before District Court Judge Sherk for the purpose of making an inquiry to determine whether or not

the defendant should have an attorney appointed to represent him; that, on that date, at the hearing, the Court, after making an inquiry of the defendant, determined that he was in a position to employ his own attorney; that between that date and the date of March 11, 1971, at which time the Preliminary Hearing was conducted, the defendant advised Officer R. H. Frye that he would not have a lawyer to represent him at the hearing and that he had decided, after conferring with his wife, to represent himself and that he had had some experience in criminal matters while in the military service, where he served for approximately five and one-half years; the Court further finds that on the date of March 11, 1971, the defendant was brought into Court before Judge Sherk and that Judge Sherk on that occasion asked the defendant if he had an attorney; that he stated that he did not and that he would represent himself; that Judge Sherk on that date and prior to that statement by the defendant had advised the defendant that he would appoint counsel to represent him, and that the defendant, McIntyre, thereupon advised the Court that he did not want an attorney; and the Court further finds that Judge Sherk advised him as to the charge against him and as to the nature thereof and the Statutory punishment therefor, and the nature of the proceedings taking place and of his right to assignment of counsel and the consequences of a waiver; all of which the defendant told the Court that he fully understood.

"This Court further finds that the defendant, McIntyre, stated to the Court that he did not desire the assignment of counsel and that he expressly waived the same and that he desired to appear at the Preliminary Hearing in all respects in his own behalf, which he said he understood he had the right to do.

"The Court finds that he signed on the date of March 3rd, 1971, a waiver of right to have counsel assigned, and that he swore to the same and subscribed his name following said waiver before a representative of the Clerk of Superior Court's Office, Mr. J. R. Reece, on March 11, 1971."

The court further found:

" . . . [T]hat, prior to and at the Preliminary Hearing, Judge Sherk informed the defendant that he thought he

should have an attorney, despite the fact that the defendant said he wanted to waive his right to an attorney and that Judge Sherk, notwithstanding that fact, designated an attorney present in the courtroom at that time, Mr. George Thomas, who is a licensed attorney in the State of North Carolina and who engages in the practice of law in Winston-Salem, to sit next to the defendant and to be there for the purpose of advising the defendant at any time he cared to take advantage of any advice that he might give; and that Judge Sherk explained to the defendant and to Mr. Thomas the reason why Mr. Thomas was being placed next to the defendant, that reason being to advise him or to be available to represent him, should he choose to utilize his services at the Preliminary Hearing.

"The Court further finds that once or twice during the hearing that proceeded, the defendant did, in fact, ask certain questions of Mr. Thomas and that immediately prior to the hearing, Mr. Thomas and the defendant conferred briefly."

[2-4] In North Carolina a preliminary hearing is not a constitutional requirement nor is it essential to the finding of an indictment. *State v. Gasque*, 271 N.C. 323, 156 S.E. 2d 740 (1967), cert. denied 390 U.S. 1030, 20 L.Ed. 2d 288, 88 S.Ct. 1423 (1968). The preliminary hearing may be waived (G.S. 15-85), in which case the defendant is bound over to the superior court to await grand jury action without forfeiting any right or defense available to him. *State v. Hargett*, 255 N.C. 412, 121 S.E. 2d 589 (1961). However, G.S. 7A-451(b)(4) provides that a preliminary hearing is a critical stage in a criminal proceeding and that an indigent person is entitled to services of counsel at such hearing.

Defendant relies on *Coleman v. Alabama*, 399 U.S. 1, 26 L.Ed. 2d 387, 90 S.Ct. 1999 (1970). This decision also holds that a preliminary hearing is a critical stage of the proceeding so as to require the presence of counsel. In *Coleman*, the opinion written by Mr. Justice Brennan states:

" . . . Plainly the guiding hand of counsel at the preliminary hearing is essential to protect the indigent accused against an erroneous or improper prosecution. . . .

"The inability of the indigent accused on his own to realize these advantages of a lawyer's assistance compels the conclusion that the Alabama preliminary hearing is a 'critical stage' of the State's criminal process at which the accused is 'as much entitled to such aid [of counsel] . . . as at the trial itself.' *Powell v. Alabama, supra* [287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527 (1932)] at 57, 77 L.Ed. at 164, 84 A.L.R. 527."

[5]   Both *Coleman* and G.S. 7A-451(b)(4) apply to an indigent person. Judge Sherk, upon competent evidence, found that for the purpose of the preliminary hearing defendant McIntyre was not an indigent and was in a position to employ his own attorney. This Court is bound by that finding. *State v. McRae,* 276 N.C. 308, 172 S.E. 2d 37 (1970); *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968); *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966). Not being indigent for the purpose of the preliminary hearing, McIntyre did not have the right to appointed counsel, and he could waive counsel and elect to defend himself. Before the preliminary hearing began, the court again inquired as to whether or not McIntyre wished counsel to be appointed. He specifically replied that he did not, stating that he had had some experience while in the service and wished to represent himself. He then signed a written waiver of counsel which he had a right to do. *State v. Williams,* 274 N.C. 328, 339, 163 S.E. 2d 353, 361 (1968), and cases therein cited.

In *State v. McNeil,* 263 N.C. 260, 268, 139 S.E. 2d 667, 672 (1965), this Court said:

"The United States Constitution does not deny to a defendant the right to defend himself. Nor does the constitutional right to assistance of counsel justify forcing counsel upon a defendant in a criminal action who wants none. *Moore v. Michigan,* 355 U.S. 155, 2 L.Ed. 2d 167; *Carter v. Illinois,* 329 U.S. 173, 91 L.Ed. 172; *United States v. Johnson,* 6 Cir. (June 1964), 333 F. 2d 1004."

Under the circumstances of this case, the refusal of the trial court to appoint counsel to represent defendant McIntyre at the preliminary hearing was not error, and the court properly overruled defendant's motion to suppress all evidence presented at the preliminary hearing.

Before the trial, Judge Kivett, in accordance with G.S. 7A-450 (c), which provides that the question of indigency may be determined or redetermined by the court at any stage of the action, made a further finding that for the purpose of trial defendant McIntyre was an indigent and appointed William G. Pfefferkorn to represent him. Mr. Pfefferkorn was later appointed to perfect this appeal.

It appears from the record that Mr. R. H. Frye talked to defendant McIntyre on 9 March 1971 prior to the preliminary hearing. At that time Mr. Frye told defendant that he would need a lawyer for the preliminary hearing. Defendant stated that he was going to leave it up to his wife as to whether or not he should employ an attorney. After that, and before the hearing, defendant told Mr. Frye he was going to represent himself at the preliminary hearing.

These facts all fully support the findings of Judge Kivett:

" . . . [T]hat never, at any time, at the hearing on March 11, 1971, did the defendant indicate to the Court that he wanted an attorney present to represent him; that at no point, at any time, either on March 8, 1971, or on March 11, 1971, was the defendant denied the right to counsel and that he had been fully advised of his right to have counsel present."

And they also support Judge Kivett's conclusion:

" . . . [T]he Court ascertains, finds, and determines beyond a reasonable doubt from clear and convincing evidence that there was no violation of the defendant's Constitutional Rights at the Preliminary Hearing in this case and that the defendant freely, understandingly, intelligently, voluntarily and knowingly, without promise or coercion of any kind, waived his right to have an attorney present at that time to represent him; that the presence of the defendant in District Court, without counsel being directly appointed to represent him, has not prejudiced or harmed the defendant's right to a fair trial, de novo, in the Superior Court."

See *Coleman v. Alabama, supra; Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967).

[6] Defendants next assert that the trial court committed prejudicial error when it allowed the State's witness Dr. Wisotzkey to give expert testimony before he was found by the court to be an expert witness. Dr. Wisotzkey testified:

"I am assistant professor of pathology in neuropathology at Bowman Gray School of Medicine. Neuropathology is the study of diseases of the brain and spinal cord and peripheral nervous system. I attended and graduated from the University of Maryland School of Medicine, 1961, with a degree in Doctor of Medicine. I have six years of postgraduate training, two years general pathology and two years of neuropathology and a year of clinical and of neurology research. Following this, I spent two years in the U. S. Army. At that time I was at the Armed Forces Institute of Pathology in Washington which is the military review institution for all military pathology. We review all military autopsies and most of the military surgery and in 1969 I came here to Bowman Gray.

"I was working for the Baptist Hospital as assistant professor of pathology on January 6. I had an occasion to perform and assist in performing an autopsy on one Roy H. Minor."

After stating these qualifications, Dr. Wisotzkey testified at length as to what he found at the autopsy. When asked if he had an opinion satisfactory to himself as to the cause of Mr. Minor's death, defendants objected. The jury was sent out, and Dr. Wisotzkey was again examined as to his qualifications. Following this examination, the court found him to be an expert medical doctor, specializing in pathology, and qualified to give his opinion in that regard. Dr. Wisotzkey then testified that in his opinion Mr. Minor died of severe brain injury due to a gunshot wound in the head.

In *State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839 (1969), this Court said:

"In the absence of a request by the appellant for a finding by the trial court as to the qualification of a witness as an expert, it is not essential that the record show an express finding on this matter, the finding, one way or the other, being deemed implicit in the ruling admitting or rejecting the opinion testimony of the witness. *Paris v.*

*Aggregates, Inc.,* 271 N.C. 471, 157 S.E. 2d 131; *Kientz v. Carlton,* 245 N.C. 236, 96 S.E. 2d 14; *State v. Coal Company,* 210 N.C. 742, 188 S.E. 412; *Brewer v. Valk,* 177 N.C. 476, 99 S.E. 358; Stansbury, North Carolina Evidence, 2d Ed., § 133; Strong, N. C. Index, 2d Ed., Evidence, § 48."

However, in the present case, when defendants objected to the doctor's giving an opinion as to the cause of death, the court did examine the witness further as to his qualifications and found him to be a medical expert. This finding will not be disturbed when, as here, there was ample evidence to support it. *State v. Smith,* 221 N.C. 278, 20 S.E. 2d 313 (1942). This assignment is overruled.

[7]    Defendants next contend that the trial court erred in allowing testimony to the effect that defendants were members of a group known as the "Mau Mau." Defendants contend that this evidence was irrelevant and that its admission was error in that it tended to prejudice the defendants in the eyes of the jury.

There was no evidence concerning the nature of the group except that the membership was composed of the three defendants in this case and Bobby Hairston and Durkin Woodruff; that the leader of the group was Earnest McIntyre; that the group met twice a week at each other's homes; and that the members would go out into the woods and practice shooting. This evidence was pertinent to the State's case. It showed that defendants knew each other, associated together, had access to firearms, and had practice and training in the use of such firearms, all of which was relevant and material to support the State's theory of a conspiracy to rob and, if necessary, to kill Mr. Minor.

In *State v. Cox,* 201 N.C. 357, 160 S.E. 358 (1931), this Court said:

". . . The State could not be deprived of the benefit of evidence which was relevant and material because it might also have a tendency to prejudice the defendants in the eyes of the jury."

And in *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954), it is stated:

". . . The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought

to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected. . . ."

See also *State v. Sneeden,* 274 N.C. 498, 502, 164 S.E. 2d 190, 193 (1968) ; 2 Strong, N. C. Index 2d, Criminal Law § 33, p. 532. This assignment is overruled.

[8]   Defendants next contend that the court erred in charging the jury that "general malice is wickedness, a disposition to do wrong, a black and diabolical heart regardless of social duty and fatally bent on mischief," for the reason that it was prejudicial to defendants; that the use of the word "black" made reference to the fact that the defendants were Negroes, and that this reference to race was prejudicial error. This assignment is without merit. The word "black" was not used with reference to the color of the defendants, but rather as an adjective synonymous with evil. In *State v. Knotts,* 168 N.C. 173, 184, 83 S.E. 972, 977 (1914), the Court approved the same definition of general malice. This is also the definition given in Black's Law Dictionary, Revised Fourth Edition, p. 1109.

[9]   Defendants next contend that the trial court committed prejudicial error in denying defendants' motions for nonsuit at the close of the State's evidence and at the close of all the evidence. This assignment is overruled. There is ample evidence from which the jury could find that while defendants were carrying out a conspiracy to rob Mr. Minor, and while actually engaged in the perpetration or attempted perpetration of the felony of robbery, one of the defendants shot and killed Mr. Minor. This is sufficient to overcome the motions for judgment as of nonsuit. *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970), and cases cited therein.

Defendants next contend that it was error for the court to allow the witness Bobby Hairston to testify that on the way from his house to the wooded area behind Mr. Minor's store he asked the group where they were going and received the answer that they "were going to knock a store off." Defendants insist that this testimony should have been excluded as hearsay because the witness did not know who answered his question.

[10, 11]   When a conspiracy has been established, declarations of any one of the conspirators made while the conspiracy is in existence and in furtherance of the common design are admis-

sible against the other conspirators. Here, all the evidence tended to show that a conspiracy to rob Mr. Minor existed, and that the declaration was made by one of the defendants while on the way to the scene of the crime. For that reason, the testimony would be competent. *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487 (1970) ; *State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39 (1969) ; *State v. Gallimore,* 272 N.C. 528, 158 S.E. 2d 505 (1968) ; *State v. Davis,* 177 N.C. 573, 98 S.E. 785 (1919) ; Stansbury, N. C. Evidence § 173 (2d Ed. 1963) ; 2 Strong, N. C. Index 2d, Conspiracy § 5.

[12] Defendants next contend that the court erred in allowing the solicitor to ask leading questions of State's witness Bobby Hairston, who himself was involved in the perpetration of the crime charged. In his initial statement to the police, this witness had not implicated defendant McIntyre in the shooting, and the leading questions were intended to show why he had not done so. The witness was naturally hesitant to testify, explaining that he was afraid of McIntyre because McIntyre had threatened to kill him if he talked. The court has discretionary power to permit leading questions to be asked and when there is no abuse of this discretion it will not be reviewed on appeal. *State v. Johnson,* 272 N.C. 239, 158 S.E. 2d 95 (1967) ; *State v. Painter,* 265 N.C. 277, 144 S.E. 2d 6 (1965) ; *State v. Pearson,* 258 N.C. 188, 128 S.E. 2d 251 (1962) ; *State v. Beatty,* 226 N.C. 765, 40 S.E. 2d 357 (1946) ; Stansbury, N. C. Evidence § 31 (2d Ed. 1963). No abuse of discretion is shown, and this assignment is overruled.

[13, 14] Sergeant Burke, a member of the detective division of the Winston-Salem Police Department, testified that he viewed the scene of the crime on the night of the murder and the next day, and that when standing in the place from which the shot allegedly was fired, he could see the spot where Mr. Minor fell. Defendants contend that the admission of this testimony was error. Defendants in their briefs quote from 3 Strong, N. C. Index 2d, Evidence § 19, p. 625:

> "Whether the existence of a state of affairs at one time is competent to show the existence of the same state at another time is a question of materiality or remoteness to be determined upon the facts of each particular case in accordance with the nature of the subject matter, the length of time intervening, and a showing, if any, as to whether con-

ditions had remained unchanged; the determination of competency rests largely in the discretion of the trial court. It is required that there be reasonable proximity in time, or proof that the conditions remained the same."

The fact that Sergeant Burke examined the scene the night of the murder and again the next morning meets the requirement that there be a reasonable proximity in time. Moreover, the determination of competency of such evidence rests largely in the discretion of the trial court. *Jenkins v. Hawthorne,* 269 N.C. 672, 153 S.E. 2d 339 (1967). Here, no abuse of discretion is shown. It is also noted that Sergeant Burke had previously given the same testimony without objection. For this reason, the benefit of the later objection would be lost. Stansbury, N. C. Evidence § 30 (2d Ed. 1963); *Shelton v. R. R.,* 193 N.C. 670, 139 S.E. 232 (1927); *Smith v. R. R.,* 163 N.C. 143, 79 S.E. 433 (1913). This assignment is overruled.

[15] Defendants contend that the trial court failed to correctly charge on the law of accomplice testimony. The court charged as follows:

"There is evidence here which tends to show in this case or in these cases that have been consolidated for trial that the witnesses for the State, Robert Hairston and Durkin Woodruff, were accomplices in the commission of the crime charged in these cases. I instruct you that an accomplice is a person who joins with another in the commission of a crime. The accomplice may actually take part in acts necessary to accomplish the crime or he may knowingly help or encourage another in the crime either before or during its commission. An accomplice is considered by the law to have an interest in the outcome of the case. If you find that these witnesses were accomplices, you should *examine* every part of their testimony with the *greatest care and caution.* If, after doing so, you believe their testimony in whole or in part, you should treat what you believe—that which you believe—the same as you would any other believable evidence." (Emphasis added.)

Defendants contend that in lieu of the above the court should have charged as follows:

"The court charges you that an accomplice is an interested witness; that he has an interest in the outcome of

your verdict in this case. And so, the court charged you that you should *scrutinize and look carefully* into the testimony of the accomplices, Bobby Hairston and Durkin Woodruff. But, if after you have looked carefully into and scrutinized their testimony, you believe they are telling the truth about the matter, then you would give the same weight and the same belief to their testimony that you would to that of any disinterested witness who may have testified." (Emphasis added.)

While it is true that the charge as contended for by the defendants is correct, it is equally true that the charge as given—that the jury should examine the testimony of the accomplices with the "greatest care and caution"—is in fact stating to the jury that they "should scrutinize and look carefully into the testimony of the accomplices." Defendants' contentions are based on a distinction without a difference. The charge as given by the court is very similar to that adopted by the Committee on Pattern Jury Instructions of the North Carolina Conference of Superior Court Judges. N.C.P.I. Crim. (tentative) 104.25. There is no merit to this assignment.

Defendants next assign as error the failure of the court to instruct the jury that they could find the defendants guilty of murder in the second degree. This assignment is without merit.

"Where all the evidence tends to show that the homicide was committed by lying in wait, or in the perpetration or attempted perpetration of robbery or rape, the court correctly charges the jury either to convict the defendant of murder in the first degree, if the evidence satisfied them beyond a reasonable doubt, or to acquit the defendant if not so satisfied. The same rule applies when the evidence tends to show that the defendants conspired together to commit the felony and the homicide was committed by one of them in the perpetration or attempted perpetration of a felony. . . ." 4 Strong, N. C. Index 2d, Homicide § 30.

[16] G.S. 14-17 provides in pertinent part: "A murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree. . . ." A murder committed in the perpetration or attempt to perpetrate any fel-

ony within the purview of G.S. 14-17 is murder in the first degree, irrespective of premeditation or deliberation or malice aforethought. *State v. Maynard,* 247 N.C. 462, 101 S.E. 2d 340 (1958), and cases cited. *Accord, State v. Rich,* 277 N.C. 333, 177 S.E. 2d 422 (1970); *State v. Fox, supra; State v. Henderson,* 276 N.C. 430, 173 S.E. 2d 291 (1970); *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969).

[17]　The evidence in the present case is to the effect that this group of five assembled at the home of Bobby Hairston; that they proceeded to an area near Mr. Minor's grocery store and there discussed robbing Mr. Minor and which one would do the shooting; that after some discussion they split into two groups, two staying in the wooded area near the grocery store and three proceeding to the store to rob Mr. Minor; and that one of the two who stayed in the woods, upon seeing Mr. Minor emerge from the grocery store, shot and killed him. All the evidence is to the effect that Mr. Minor was killed in the perpetration or attempted perpetration of a felony—robbery. Under these circumstances, it was not necessary for the court to charge on second degree murder, and the failure to do so was not error.

[18]　Defendants next contend that the court should have instructed the jury on the law regarding the abandonment of a conspiracy, and further that if the conspiracy was abandoned, the other defendants would not be accountable for the independent act of Charles Hairston. Bobby Hairston testified in part:

> "All five of us were together in the woods. We stayed in the woods for a few moments and then we had discussion of who was going to shoot the gun. We had the discussion among ourselves. So, I decided instead of shooting the man we just run around and snatch the money and run. So, then, I gave the gun to Charles Hairston, the defendant here. And Mr. McIntyre and Edward Howard and myself went around the corner. It was my shotgun. We were going to hit the man, snatch the money, and run."

Durkin Woodruff testified:

> "All five of us were present in the woods at that time. We sit down. Earnest McIntyre told me to stay with Charles up on the hill in the woods nearby the store. When Charles shot the man, they were going around to get the money. We

talked about how we were going to rob the man that owned this store. Charles and Bobby was choosing over the gun and who was going to shoot. Charles got the gun and Robert left then with Ed Howard and Earnest McIntyre. . . . From the spot in the woods, we could see the Minor's store and the bridge. . . . First, I saw this boy come out of the store and put something in the car on the bridge. Then the man came out of the store. The boy left from the car. Then the man came to get something. He had something in his hand. I could see the man from the woods. And the man came out of the store and then Charles said, 'There he go,' and say, 'I can't get to him,' and then he moved over to him and then he shot and I saw the man grab his head. I saw the man fall. Charles shot."

This testimony clearly shows that the original conspiracy to rob Mr. Minor had not been abandoned, and that the defendants were continuing their efforts to carry out the plan to rob him.

In *State v. Smith,* 221 N.C. 400, 405, 20 S.E. 2d 360, 363-64 (1942), it is said:

" . . . If many engage in an unlawful conspiracy, to be executed in a given manner, and some of them execute it in another manner, yet their act, though different in the manner, is the act of all who conspired. *S. v. Bell,* 205 N.C. 225, 171 S.E. 50; 1 Bishop on Crim. Law (9 Ed.), 465.

"And the liability also extends to acts not intended or contemplated as a part of the original design, but which are a natural or probable consequence of the unlawful combination or undertaking. *S. v. Williams,* 216 N.C. 446, 5 S.E. (2d) 314; *S. v. Beal,* 199 N.C., p. 294, 154 S.E. 604; 1 Brill's Cyclopedia Crim. Law, 464. The general rule is, that if a number of persons combine or conspire to commit a crime, or to engage in an unlawful enterprise, each is responsible for all acts committed by the others in the execution of the common purpose which are a natural or probable consequence of the unlawful combination or undertaking, even though such acts are not intended or contemplated as a part of the original design. *S. v. Williams, supra; S. v. Powell, supra* [168 N.C. 134, 83 S.E. 310] ; *S. v. Lea, supra* [203 N.C. 13, 164 S.E. 747] ; *S. v. Stewart,* 189 N.C. 340, 127 S.E. 260. In the *McCahill case, supra* [*S. v.*

*McCahill,* 72 Iowa, 111], it was held that where a large number of persons combined to drive employees from premises, and in carrying out the conspiracy, one committed a murder, the rest, who did not intend it, were also guilty. And in the *Bell case, supra,* where six persons were charged with conspiracy to burglarize a house, and a murder was committed by one of the conspirators in the attempted perpetration of the burglary, it was said that each and all of the conspirators were properly tried for the murder, albeit one of the defendants remained a distance from the scene of the crime."

*Accord, State v. Fox, supra.*

In the present case, the evidence shows that all defendants had formed a conspiracy to rob Mr. Minor, and that in attempting to perpetrate this crime Charles Hairston shot and killed Mr. Minor. Under these facts, each and all of the conspirators are guilty of murder in the first degree, and the court correctly refused to charge that the conspiracy had been abandoned, and that the other defendants were not accountable for the act of Charles Hairston.

The other assignments of error, although formal, have been carefully considered and found to be without merit.

For the reasons indicated, the verdicts and judgments will not be disturbed.

No error.